# UNITED STATES *v.* HUBBELL

No. 99–166.   Argued February 22, 2000—Decided June 5, 2000

28

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a concurring opinion, in which SCALIA, J., joined, *post,* p. 49. REHNQUIST, C. J., filed a dissenting statement, *post,* p. 49.

*Ronald J. Mann* argued the cause for the United States. With him on the briefs were *Robert W. Ray, Paul Rosenzweig, David G. Barger,* and *Karl N. Gellert.*

*Deputy Solicitor General Dreeben* argued the cause for the United States Department of Justice as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson,* and *Malcolm L. Stewart.*

*John W. Nields, Jr.,* argued the cause for respondent. With him on the brief was *Laura S. Shores.**

JUSTICE STEVENS delivered the opinion of the Court.

The two questions presented concern the scope of a witness' protection against compelled self-incrimination: (1) whether the Fifth Amendment privilege[1] protects a

---

*\*Ellen S. Podgor* and *Lisa Kemler* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

[1] "No person . . . shall be compelled in any criminal case to be a witness against himself." U. S. Const., Amdt. 5.

witness from being compelled to disclose the existence of incriminating documents that the Government is unable to describe with reasonable particularity; and (2) if the witness produces such documents pursuant to a grant of immunity, whether 18 U. S. C. § 6002 prevents the Government from using them to prepare criminal charges against him.[2]

## I

This proceeding arises out of the second prosecution of respondent, Webster Hubbell, commenced by the Independent Counsel appointed in August 1994 to investigate possible violations of federal law relating to the Whitewater Development Corporation. The first prosecution was terminated pursuant to a plea bargain. In December 1994, respondent pleaded guilty to charges of mail fraud and tax evasion arising out of his billing practices as a member of an Arkansas law firm from 1989 to 1992, and was sentenced to 21 months in prison. In the plea agreement, respondent promised to provide the Independent Counsel with "full, complete, accurate, and truthful information" about matters relating to the Whitewater investigation.

The second prosecution resulted from the Independent Counsel's attempt to determine whether respondent had vio-

---

[2] Section 6002 provides: "Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

"(1) a court or grand jury of the United States,

"(2) an agency of the United States, or

"(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

"and the person presiding over the proceeding communicates to the witness an order issued under this title, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

lated that promise. In October 1996, while respondent was incarcerated, the Independent Counsel served him with a subpoena *duces tecum* calling for the production of 11 categories of documents before a grand jury sitting in Little Rock, Arkansas. See Appendix, *infra*. On November 19, he appeared before the grand jury and invoked his Fifth Amendment privilege against self-incrimination. In response to questioning by the prosecutor, respondent initially refused "to state whether there are documents within my possession, custody, or control responsive to the Subpoena." App. 62. Thereafter, the prosecutor produced an order, which had previously been obtained from the District Court pursuant to 18 U. S. C. § 6003(a),[3] directing him to respond to the subpoena and granting him immunity "to the extent allowed by law."[4] Respondent then produced 13,120 pages of documents and records and responded to a series of questions that established that those were all of the documents in his custody or control that were responsive to the commands in the subpoena, with the exception of a few documents he claimed were shielded by the attorney-client and attorney work-product privileges.

The contents of the documents produced by respondent provided the Independent Counsel with the information that led to this second prosecution. On April 30, 1998, a grand jury in the District of Columbia returned a 10-count indictment charging respondent with various tax-related crimes and mail and wire fraud.[5] The District Court dismissed the

---

[3] Section 6003(a) authorizes a district court to issue an order requiring an "individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination." The effect of such an order is covered by § 6002, quoted in n. 2, *supra*.

[4] *In re Grand Jury Proceedings*, No. GJ–96–3 (ED Ark., Nov. 14, 1996), App. 60–61.

[5] Several of the counts in the indictment also named three other defendants. Those charges are not relevant because (a) they have been dismissed with prejudice, and (b) the Fifth Amendment privilege asserted

indictment relying, in part, on the ground that the Independent Counsel's use of the subpoenaed documents violated § 6002 because all of the evidence he would offer against respondent at trial derived either directly or indirectly from the testimonial aspects of respondent's immunized act of producing those documents.[6] 11 F. Supp. 2d 25, 33–37 (DC 1998). Noting that the Independent Counsel had admitted that he was not investigating tax-related issues when he issued the subpoena, and that he had " 'learned about the unreported income and other crimes from studying the records' contents,'" the District Court characterized the subpoena as "the quintessential fishing expedition." *Id.*, at 37.

The Court of Appeals vacated the judgment and remanded for further proceedings. 167 F. 3d 552 (CADC 1999). The majority concluded that the District Court had incorrectly relied on the fact that the Independent Counsel did not have prior knowledge of the contents of the subpoenaed documents. The question the District Court should have addressed was the extent of the Government's independent knowledge of the documents' existence and authenticity, and of respondent's possession or control of them. It explained:

> "On remand, the district court should hold a hearing in which it seeks to establish the extent and detail of the [G]overnment's knowledge of Hubbell's financial affairs (or of the paperwork documenting it) on the day the subpoena issued. It is only then that the court will be in a position to assess the testimonial value of Hubbell's response to the subpoena. Should the Independent Counsel prove capable of demonstrating with reasonable

---

by respondent would not, in any event, affect the charges against those other defendants.

[6] As an independent basis for dismissal, the District Court also concluded that the Independent Counsel had exceeded his jurisdiction under the Ethics in Government Act of 1978, as amended by the Independent Counsel Reauthorization Act of 1994, 28 U. S. C. §§ 591–599. That holding was reversed by the Court of Appeals and is not at issue here.

particularity a prior awareness that the exhaustive litany of documents sought in the subpoena existed and were in Hubbell's possession, then the wide distance evidently traveled from the subpoena to the substantive allegations contained in the indictment would be based upon legitimate intermediate steps. To the extent that the information conveyed through Hubbell's compelled act of production provides the necessary linkage, however, the indictment deriving therefrom is tainted." *Id.*, at 581.

In the opinion of the dissenting judge, the majority failed to give full effect to the distinction between the contents of the documents and the limited testimonial significance of the act of producing them. In his view, as long as the prosecutor could make use of information contained in the documents or derived therefrom without any reference to the fact that respondent had produced them in response to a subpoena, there would be no improper use of the testimonial aspect of the immunized act of production. In other words, the constitutional privilege and the statute conferring use immunity would only shield the witness from the use of any information resulting from his subpoena response "beyond what the prosecutor would receive if the documents appeared in the grand jury room or in his office unsolicited and unmarked, like manna from heaven."[7]  *Id.*, at 602.

On remand, the Independent Counsel acknowledged that he could not satisfy the "reasonable particularity" standard prescribed by the Court of Appeals and entered into a conditional plea agreement with respondent. In essence, the agreement provides for the dismissal of the charges unless this Court's disposition of the case makes it reasonably likely that respondent's "act [of] production immunity" would not

---

[7] Over the dissent of four judges, the Court of Appeals denied a suggestion for rehearing en banc. App. to Pet. for Cert. 142a–143a.

pose a significant bar to his prosecution. App. 106–107. The case is not moot, however, because the agreement also provides for the entry of a guilty plea and a sentence that will not include incarceration if we should reverse and issue an opinion that is sufficiently favorable to the Government to satisfy that condition. *Ibid.* Despite that agreement, we granted the Independent Counsel's petition for a writ of certiorari in order to determine the precise scope of a grant of immunity with respect to the production of documents in response to a subpoena. 528 U. S. 926 (1999). We now affirm.

## II

It is useful to preface our analysis of the constitutional issue with a restatement of certain propositions that are not in dispute. The term "privilege against self-incrimination" is not an entirely accurate description of a person's constitutional protection against being "compelled in any criminal case to be a witness against himself."

The word "witness" in the constitutional text limits the relevant category of compelled incriminating communications to those that are "testimonial" in character.[8] As Justice Holmes observed, there is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct

---

[8] "It is consistent with the history of and the policies underlying the Self-Incrimination Clause to hold that the privilege may be asserted only to resist compelled explicit or implicit disclosures of incriminating information. Historically, the privilege was intended to prevent the use of legal compulsion to extract from the accused a sworn communication of facts which would incriminate him. Such was the process of the ecclesiastical courts and the Star Chamber—the inquisitorial method of putting the accused upon his oath and compelling him to answer questions designed to uncover uncharged offenses, without evidence from another source. See *Andresen* v. *Maryland*, 427 U. S. 463, 470–471 (1976); 8 Wigmore § 2250; E. Griswold, The Fifth Amendment Today 2–3 (1955)." *Doe* v. *United States*, 487 U. S. 201, 212 (1988).

that may be incriminating.[9]   Thus, even though the act may provide incriminating evidence, a criminal suspect may be compelled to put on a shirt,[10] to provide a blood sample[11] or handwriting exemplar,[12] or to make a recording of his voice.[13] The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief. *Pennsylvania* v. *Muniz*, 496 U. S. 582, 594–598 (1990).   Similarly, the fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return,[14] maintaining required records,[15] or reporting an accident,[16] does not clothe such required conduct with the testimonial privilege.[17]

More relevant to this case is the settled proposition that a person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not "compelled"

---

[9] "A question arose as to whether a blouse belonged to the prisoner. A witness testified that the prisoner put it on and it fitted him. It is objected that he did this under the same duress that made his statements inadmissible, and that it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof." *Holt* v. *United States*, 218 U. S. 245, 252–253 (1910).

[10] *Ibid.*

[11] *Schmerber* v. *California*, 384 U. S. 757 (1966).

[12] *Gilbert* v. *California*, 388 U. S. 263 (1967).

[13] *United States* v. *Wade*, 388 U. S. 218 (1967).

[14] *United States* v. *Sullivan*, 274 U. S. 259 (1927).

[15] *Shapiro* v. *United States*, 335 U. S. 1 (1948).

[16] *California* v. *Byers*, 402 U. S. 424 (1971).

[17] "The Court has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws." *Baltimore City Dept. of Social Servs.* v. *Bouknight*, 493 U. S. 549, 556 (1990).

within the meaning of the privilege. Our decision in *Fisher* v. *United States*, 425 U. S. 391 (1976), dealt with summonses issued by the Internal Revenue Service (IRS) seeking working papers used in the preparation of tax returns. Because the papers had been voluntarily prepared prior to the issuance of the summonses, they could not be "said to contain compelled testimonial evidence, either of the taxpayers or of anyone else." Accordingly, the taxpayer could not "avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his own or that of someone else." *Id.*, at 409–410; see also *United States* v. *Doe*, 465 U. S. 605 (1984).[18] It is clear, therefore, that respondent Hubbell could not avoid compliance with the subpoena served on him merely because the demanded documents contained incriminating evidence, whether written by others or voluntarily prepared by himself.

On the other hand, we have also made it clear that the act of producing documents in response to a subpoena may have a compelled testimonial aspect. We have held that "the act of production" itself may implicitly communicate "statements of fact." By "producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic."[19]

---

[18] "Respondent does not contend that he prepared the documents involuntarily or that the subpoena would force him to restate, repeat, or affirm the truth of their contents. The fact that the records are in respondent's possession is irrelevant to the determination of whether the creation of the records was compelled. We therefore hold that the contents of those records are not privileged." *United States* v. *Doe*, 465 U. S., at 611–612 (footnote omitted).

[19] "The issue presented in those cases was whether the act of producing subpoenaed documents, not itself the making of a statement, might nonetheless have some protected testimonial aspects. The Court concluded that the act of production could constitute protected testimonial communication because it might entail implicit statements of fact: by producing

Moreover, as was true in this case, when the custodian of documents responds to a subpoena, he may be compelled to take the witness stand and answer questions designed to determine whether he has produced everything demanded by the subpoena.[20] The answers to those questions, as well as the act of production itself, may certainly communicate information about the existence, custody, and authenticity of the documents. Whether the constitutional privilege protects the answers to such questions, or protects the act of production itself, is a question that is distinct from the question whether the unprotected contents of the documents themselves are incriminating.

Finally, the phrase "in any criminal case" in the text of the Fifth Amendment might have been read to limit its coverage to compelled testimony that is used against the defendant in the trial itself. It has, however, long been settled that its protection encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence. Thus, a half century ago we held

---

documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic. *United States* v. *Doe*, 465 U. S., at 613, and n. 11; *Fisher*, 425 U. S., at 409–410; *id.*, at 428, 432 (concurring opinions). See *Braswell* v. *United States*, [487 U. S.,] at 104; [*id.*,] at 122 (dissenting opinion). Thus, the Court made clear that the Fifth Amendment privilege against self-incrimination applies to acts that imply assertions of fact.

". . . An examination of the Court's application of these principles in other cases indicates the Court's recognition that, in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." *Doe* v. *United States*, 487 U. S., at 209–210 (footnote omitted).

[20] See App. 62–70. Thus, for example, after respondent had been duly sworn by the grand jury foreman, the prosecutor called his attention to paragraph A of the Subpoena Rider (reproduced in the Appendix, *infra*, at 46) and asked whether he had produced "all those documents." App. 65.

that a trial judge had erroneously rejected a defendant's claim of privilege on the ground that his answer to the pending question would not itself constitute evidence of the charged offense. As we explained:

> "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951).

Compelled testimony that communicates information that may "lead to incriminating evidence" is privileged even if the information itself is not inculpatory. *Doe* v. *United States,* 487 U. S. 201, 208, n. 6 (1988). It is the Fifth Amendment's protection against the prosecutor's use of incriminating information derived directly or indirectly from the compelled testimony of the respondent that is of primary relevance in this case.

### III

Acting pursuant to 18 U. S. C. § 6002, the District Court entered an order compelling respondent to produce "any and all documents" described in the grand jury subpoena and granting him "immunity to the extent allowed by law." App. 60–61. In *Kastigar* v. *United States,* 406 U. S. 441 (1972), we upheld the constitutionality of § 6002 because the scope of the "use and derivative-use" immunity that it provides is coextensive with the scope of the constitutional privilege against self-incrimination. .

The protection against the derivative use of compelled testimony distinguishes § 6002 from the 1868 statute that had been held invalid in *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892), because it merely provided "use" immunity, as well as from the more recent federal statutes that broadly provide "transactional" immunity. In *Kastigar* the petitioners argued that, under our reasoning in *Counselman,* nothing less

than full transactional immunity from prosecution for any offense to which compelled testimony relates could suffice to supplant the privilege. In rejecting that argument, we stressed the importance of § 6002's "explicit proscription" of the use in any criminal case of " 'testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information).' " 406 U. S., at 453. We particularly emphasized the critical importance of protection against a future prosecution " 'based on knowledge and sources of information obtained from the compelled testimony.' " *Id.*, at 454 (quoting *Ullmann* v. *United States*, 350 U. S. 422, 437 (1956)).[21]

We also rejected the petitioners' argument that derivative-use immunity under § 6002 would not obviate the risk that the prosecutor or other law enforcement officials may use compelled testimony to obtain leads, names of witnesses, or other information not otherwise available to support a prosecution. That argument was predicated on the incorrect assumption that the derivative-use prohibition would prove impossible to enforce. But given that the statute contains a "comprehensive safeguard" in the form of a "sweeping proscription of any use, direct or indirect, of the

---

[21] "Our holding is consistent with the conceptual basis of *Counselman.* The *Counselman* statute, as construed by the Court, was plainly deficient in its failure to prohibit the use against the immunized witness of evidence derived from his compelled testimony. The Court repeatedly emphasized this deficiency, noting that the statute:

" 'could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding . . .' 142 U. S., at 564;

.            .            .            .

"and that it:

" 'affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party.' 142 U. S., at 586." *Kastigar* v. *United States*, 406 U. S., at 453–454.

compelled testimony and any information derived there-
from," we concluded that a person who is prosecuted for
matters related to testimony he gave under a grant of immu-
nity does not have the burden of proving that his testimony
was improperly used. Instead, we held that the statute im-
poses an affirmative duty on the prosecution, not merely to
show that its evidence is not tainted by the prior testimony,
but "to prove that the evidence it proposes to use is derived
from a legitimate source wholly independent of the com-
pelled testimony." *Id.,* at 460.[22] Requiring the prosecution
to shoulder this burden ensures that the grant of immunity
has "le[ft] the witness and the Federal Government in sub-
stantially the same position as if the witness had claimed
his privilege in the absence of a grant of immunity." ·*Id.,* at
458–459 (internal quotation marks and footnote omitted).

The "compelled testimony" that is relevant in this case is
not to be found in the contents of the documents produced
in response to the subpoena. It is, rather, the testimony
inherent in the act of producing those documents. The dis-
agreement between the parties focuses entirely on the sig-
nificance of that testimonial aspect.

## IV

The Government correctly emphasizes that the testimonial
aspect of a response to a subpoena *duces tecum* does nothing

---

[22] "A person accorded this immunity under 18 U. S. C. § 6002, and sub-
sequently prosecuted, is not dependent for the preservation of his rights
upon the integrity and good faith of the prosecuting authorities. As
stated in *Murphy* [v. *Waterfront Comm'n of N. Y. Harbor,* 378 U. S. 52
(1964)]:

"'Once a defendant demonstrates that he has testified, under a state grant
of immunity, to matters related to the federal prosecution, the federal
authorities have the burden of showing that their evidence is not tainted
by establishing that they had an independent, legitimate source for the
disputed evidence.' *[Id.,]* at 79 n. 18.

"This burden of proof, which we reaffirm as appropriate, is not limited
to a negation of taint; rather, it imposes on the prosecution the affirmative
duty to prove that the evidence it proposes to use is derived from a legiti-
mate source wholly independent of the compelled testimony." *Id.,* at 460.

more than establish the existence, authenticity, and custody of items that are produced. We assume that the Government is also entirely correct in its submission that it would not have to advert to respondent's act of production in order to prove the existence, authenticity, or custody of any documents that it might offer in evidence at a criminal trial; indeed, the Government disclaims any need to introduce any of the documents produced by respondent into evidence in order to prove the charges against him. It follows, according to the Government, that it has no intention of making improper "use" of respondent's compelled testimony.

The question, however, is not whether the response to the subpoena may be introduced into evidence at his criminal trial. That would surely be a prohibited "use" of the immunized act of production. See *In re Sealed Case,* 791 F. 2d 179, 182 (CADC 1986) (Scalia, J.). But the fact that the Government intends no such use of the act of production leaves open the separate question whether it has already made "derivative use" of the testimonial aspect of that act in obtaining the indictment against respondent and in preparing its case for trial. It clearly has.

It is apparent from the text of the subpoena itself that the prosecutor needed respondent's assistance both to identify potential sources of information and to produce those sources. See Appendix, *infra.* Given the breadth of the description of the 11 categories of documents called for by the subpoena, the collection and production of the materials demanded was tantamount to answering a series of interrogatories asking a witness to disclose the existence and location of particular documents fitting certain broad descriptions. The assembly of literally hundreds of pages of material in response to a request for "any and all documents reflecting, referring, or relating to any direct or indirect sources of money or other things of value received by or provided to" an individual or members of his family during a 3-year period, Appendix, *infra,* at 46–49, is the functional equivalent of the preparation of an answer to either a detailed written

42

interrogatory or a series of oral questions at a discovery deposition. Entirely apart from the contents of the 13,120 pages of materials that respondent produced in this case, it is undeniable that providing a catalog of existing documents fitting within any of the 11 broadly worded subpoena categories could provide a prosecutor with a "lead to incriminating evidence," or "a link in the chain of evidence needed to prosecute."

Indeed, the record makes it clear that that is what happened in this case. The documents were produced before a grand jury sitting in the Eastern District of Arkansas in aid of the Independent Counsel's attempt to determine whether respondent had violated a commitment in his first plea agreement. The use of those sources of information eventually led to the return of an indictment by a grand jury sitting in the District of Columbia for offenses that apparently are unrelated to that plea agreement. What the District Court characterized as a "fishing expedition" did produce a fish, but not the one that the Independent Counsel expected to hook. It is abundantly clear that the testimonial aspect of respondent's act of producing subpoenaed documents was the first step in a chain of evidence that led to this prosecution. The documents did not magically appear in the prosecutor's office like "manna from heaven." They arrived there only after respondent asserted his constitutional privilege, received a grant of immunity, and—under the compulsion of the District Court's order—took the mental and physical steps necessary to provide the prosecutor with an accurate inventory of the many sources of potentially incriminating evidence sought by the subpoena. It was only through respondent's truthful reply to the subpoena[23] that the Government re-

---

[23] See Stuntz, Self-incrimination and Excuse, 88 Colum. L. Rev. 1227, 1228–1229, 1256–1259, 1277–1279 (1988) (discussing the conceptual link between truthtelling and the privilege in the document production context); Alito, Documents and the Privilege Against Self-Incrimination, 48 U. Pitt. L. Rev. 27, 47 (1986); 8 J. Wigmore, Evidence §2264, p. 379 (J. McNaugh-

ceived the incriminating documents of which it made "substantial use . . . in the investigation that led to the indictment." Brief for United States 3.

For these reasons, we cannot accept the Government's submission that respondent's immunity did not preclude its derivative use of the produced documents because its "possession of the documents [was] the fruit *only* of a simple physical act—the act of producing the documents." *Id.*, at 29. It was unquestionably necessary for respondent to make extensive use of "the contents of his own mind" in identifying the hundreds of documents responsive to the requests in the subpoena. See *Curcio* v. *United States,* 354 U. S. 118, 128 (1957); *Doe* v. *United States,* 487 U. S., at 210. The assembly of those documents was like telling an inquisitor the combination to a wall safe, not like being forced to surrender the key to a strongbox. *Id.*, at 210, n. 9. The Government's anemic view of respondent's act of production as a mere physical act that is principally nontestimonial in character and can be entirely divorced from its "implicit" testimonial aspect so as to constitute a "legitimate, wholly independent source" (as required by *Kastigar*) for the documents produced simply fails to account for these realities.

In sum, we have no doubt that the constitutional privilege against self-incrimination protects the target of a grand jury investigation from being compelled to answer questions designed to elicit information about the existence of sources of potentially incriminating evidence. That constitutional privilege has the same application to the testimonial aspect of a response to a subpoena seeking discovery of those sources. Before the District Court, the Government arguably conceded that respondent's act of production in this case had a testimonial aspect that entitled him to respond to the subpoena by asserting his privilege against self-incrimination. See 167 F. 3d, at 580 (noting District

ton rev. 1961) (describing a subpoena *duces tecum* as "process relying on [the witness'] moral responsibility for truthtelling").

Court's finding that "Hubbell's compelled act of production required him to make communications as to the existence, possession, and authenticity of the subpoenaed documents"). On appeal and again before this Court, however, the Government has argued that the communicative aspect of respondent's act of producing ordinary business records is insufficiently "testimonial" to support a claim of privilege because the existence and possession of such records by any businessman is a "foregone conclusion" under our decision in *Fisher* v. *United States*, 425 U. S., at 411. This argument both misreads *Fisher* and ignores our subsequent decision in *United States* v. *Doe*, 465 U. S. 605 (1984).

As noted in Part II, *supra, Fisher* involved summonses seeking production of working papers prepared by the taxpayers' accountants that the IRS knew were in the possession of the taxpayers' attorneys. 425 U. S., at 394. In rejecting the taxpayers' claim that these documents were protected by the Fifth Amendment privilege, we stated:

> "It is doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment. The papers belong to the *accountant,* were prepared by him, and are the kind usually prepared by an accountant working on the tax returns of his client. Surely the Government is in no way relying on the 'truthtelling' of the *taxpayer* to prove the existence of or his access to the documents. . . . The existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." *Id.,* at 411 (emphases added).

Whatever the scope of this "foregone conclusion" rationale, the facts of this case plainly fall outside of it. While in *Fisher* the Government already knew that the documents were in the attorneys' possession and could independently

confirm their existence and authenticity through the accountants who created them, here the Government has not shown that it had any prior knowledge of either the existence or the whereabouts of the 13,120 pages of documents ultimately produced by respondent. The Government cannot cure this deficiency through the overbroad argument that a businessman such as respondent will always possess general business and tax records that fall within the broad categories described in this subpoena. The *Doe* subpoenas also sought several broad categories of general business records, yet we upheld the District Court's finding that the act of producing those records would involve testimonial self-incrimination. 465 U. S., at 612–614, and n. 13.

Given our conclusion that respondent's act of production had a testimonial aspect, at least with respect to the existence and location of the documents sought by the Government's subpoena, respondent could not be compelled to produce those documents without first receiving a grant of immunity under § 6003. As we construed § 6002 in *Kastigar*, such immunity is coextensive with the constitutional privilege. *Kastigar* requires that respondent's motion to dismiss the indictment on immunity grounds be granted unless the Government proves that the evidence it used in obtaining the indictment and proposed to use at trial was derived from legitimate sources "wholly independent" of the testimonial aspect of respondent's immunized conduct in assembling and producing the documents described in the subpoena. The Government, however, does not claim that it could make such a showing. Rather, it contends that its prosecution of respondent must be considered proper unless someone—presumably respondent—shows that "there is some substantial relation between the compelled testimonial communications implicit in the act of production (as opposed to the act of production standing alone) and some aspect of the information used in the investigation or the evidence presented at trial." Brief for United States 9. We could not accept

this submission without repudiating the basis for our conclusion in *Kastigar* that the statutory guarantee of use and derivative-use immunity is as broad as the constitutional privilege itself. This we are not prepared to do.

Accordingly, the indictment against respondent must be dismissed. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

On October 31, 1996, upon application by the Independent Counsel, a subpoena was issued commanding respondent to appear and testify before the grand jury of the United States District Court for the Eastern District of Arkansas on November 19, 1996, and to bring with him various documents described in a "Subpoena Rider" as follows:

"A. Any and all documents reflecting, referring, or relating to any direct or indirect sources of money or other things of value received by or provided to Webster Hubbell, his wife, or children from January 1, 1993 to the present, including but not limited to the identity of employers or clients of legal or any other type of work.

"B. Any and all documents reflecting, referring, or relating to any direct or indirect sources of money of other things of value received by or provided to Webster Hubbell, his wife, or children from January 1, 1993 to the present, including but not limited to billing memoranda, draft statements, bills, final statements, and/or bills for work performed or time billed from January 1, 1993 to the present.

"C. Copies of all bank records of Webster Hubbell, his wife, or children for all accounts from January 1, 1993 to the present, including but not limited to all statements, registers and ledgers, cancelled checks, deposit items, and wire transfers.

"D. Any and all documents reflecting, referring, or relating to time worked or billed by Webster Hubbell from

January 1, 1993 to the present, including but not limited to original time sheets, books, notes, papers, and/or computer records.

"E. Any and all documents reflecting, referring, or relating to expenses incurred by and/or disbursements of money by Webster Hubbell during the course of any work performed or to be performed by Mr. Hubbell from January 1, 1993 to the present.

"F. Any and all documents reflecting, referring, or relating to Webster Hubbell's schedule of activities, including but not limited to any and all calendars, day-timers, time books, appointment books, diaries, records of reverse telephone toll calls, credit card calls, telephone message slips, logs, other telephone records, minutes, databases, electronic mail messages, travel records, itineraries, tickets for transportation of any kind, payments, bills, expense backup documentation, schedules, and/or any other document or database that would disclose Webster Hubbell's activities from January 1, 1993 to the present.

"G. Any and all documents reflecting, referring, or relating to any retainer agreements or contracts for employment of Webster Hubbell, his wife, or his children from January 1, 1993 to the present.

"H. Any and all tax returns and tax return information, including but not limited to all W–2s, form 1099s, schedules, draft returns, work papers, and backup documents filed, created or held by or on behalf of Webster Hubbell, his wife, his children, and/or any business in which he, his wife, or his children holds or has held an interest, for the tax years 1993 to the present.

"I. Any and all documents reflecting, referring, or relating to work performed or to be performed or on behalf of the City of Los Angeles, California, the Los Angeles Department of Airports or any other Los Angeles municipal Governmental entity, Mary Leslie, and/or Alan S. Arkatov, including but not limited to correspondence, retainer agree-

ments, contracts, time sheets, appointment calendars, activity calendars, diaries, billing statements, billing memoranda, telephone records, telephone message slips, telephone credit card statements, itineraries, tickets for transportation, payment records, expense receipts, ledgers, check registers, notes, memoranda, electronic mail, bank deposit items, cashier's checks, traveler's checks, wire transfer records and/or other records of financial transactions.

"J. Any and all documents reflecting, referring, or relating to work performed or to be performed by Webster Hubbell, his wife, or his children on the recommendation, counsel or other influence of Mary Leslie and/or Alan S. Arkatov, including but not limited to correspondence, retainer agreements, contracts, time sheets, appointment calendars, activity calendars, diaries, billing statements, billing memoranda, telephone records, telephone message slips, telephone credit card statements, itineraries, tickets for transportation, payment records, expense receipts, ledgers, check registers, notes, memoranda, electronic mail, bank deposit items, cashier's checks, traveler's checks, wire transfer records and/or other records of financial transactions.

"K. Any and all documents related to work performed or to be performed for or on behalf of Lippo Ltd. (formerly Public Finance (H. K.) Ltd.), the Lippo Group, the Lippo Bank, Mochtar Riady, James Riady, Stephen Riady, John Luen Wai Lee, John Huang, Mark W. Grobmyer, C. Joseph Giroir, Jr., or any affiliate, subsidiary, or corporation owned or controlled by or related to the aforementioned entities or individuals, including but not limited to correspondence, retainer agreements, contracts, time sheets, appointment calendars, activity calendars, diaries, billing statements, billing memoranda, telephone records, telephone message slips, telephone credit card statements, itineraries, tickets for transportation, payment records, expense receipts, ledgers, check registers, notes, memoranda, electronic mail, bank

deposit items, cashier's checks, traveler's checks, wire transfer records and/or other records of financial transactions." App. 47–49.

CHIEF JUSTICE REHNQUIST dissents and would reverse the judgment of the Court of Appeals in part, for the reasons given by Judge Williams in his dissenting opinion in that court, 167 F. 3d 552, 597 (CADC 1999).

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring.

Our decision today involves the application of the act-of-production doctrine, which provides that persons compelled to turn over incriminating papers or other physical evidence pursuant to a subpoena *duces tecum* or a summons may invoke the Fifth Amendment privilege against self-incrimination as a bar to production only where the act of producing the evidence would contain "testimonial" features. See *ante*, at 34–38. I join the opinion of the Court because it properly applies this doctrine, but I write separately to note that this doctrine may be inconsistent with the original meaning of the Fifth Amendment's Self-Incrimination Clause. A substantial body of evidence suggests that the Fifth Amendment privilege protects against the compelled production not just of incriminating testimony, but of any incriminating evidence. In a future case, I would be willing to reconsider the scope and meaning of the Self-Incrimination Clause.

I

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The key word at issue in this case is "witness." The Court's opinion, relying on prior cases, essentially defines "witness" as a person who provides testimony, and thus restricts the Fifth Amendment's ban to only those com-

munications "that are 'testimonial' in character." *Ante,* at 34. None of this Court's cases, however, has undertaken an analysis of the meaning of the term at the time of the founding. A review of that period reveals substantial support for the view that the term "witness" meant a person who gives or furnishes evidence, a broader meaning than that which our case law currently ascribes to the term. If this is so, a person who responds to a subpoena *duces tecum* would be just as much a "witness" as a person who responds to a subpoena *ad testificandum.*[1]

Dictionaries published around the time of the founding included definitions of the term "witness" as a person who gives or furnishes evidence. Legal dictionaries of that period defined "witness" as someone who "gives evidence in a cause." 2 G. Jacob, A New Law-Dictionary (8th ed. 1762); 2 T. Cunningham, New and Complete Law-Dictionary (2d ed. 1771); T. Potts, A Compendious Law Dictionary 612 (1803); 6 G. Jacob, The Law-Dictionary 450 (T. Tomlins 1st American ed. 1811). And a general dictionary published earlier in the century similarly defined "witness" as "a giver of evidence." J. Kersey, A New English Dictionary (1702). The term "witness" apparently continued to have this meaning at least until the first edition of Noah Webster's dictionary, which defined it as "[t]hat which furnishes evidence or proof." An American Dictionary of the English Language (1828). See also J. Story, Commentaries on the Constitution of the United States § 931 (1833) (using phrases "to give evidence" and "to furnish evidence" in explanation of the Self-Incrimination Clause). See generally Nagareda, Compul-

---

[1] Even if the term "witness" in the Fifth Amendment referred to someone who provides testimony, as this Court's recent cases suggest without historical analysis, it may well be that at the time of the founding a person who turned over documents would be described as providing testimony. See *Amey* v. *Long,* 9 East. 472, 484, 103 Eng. Rep. 653, 658 (K. B. 1808) (referring to documents requested by subpoenas *duces tecum* as "written . . . testimony").

sion "to be a witness" and the Resurrection of *Boyd*, 74 N. Y. U. L. Rev. 1575, 1608–1609 (1999).[2]

Such a meaning of "witness" is consistent with, and may help explain, the history and framing of the Fifth Amendment. The 18th-century common-law privilege against self-incrimination protected against the compelled production of incriminating physical evidence such as papers and documents. See Morgan, The Privilege against Self-Incrimination, 34 Minn. L. Rev. 1, 34 (1949); Nagareda, *supra*, at 1618–1623. Several 18th-century cases explicitly recognized such a self-incrimination privilege. See *Roe* v. *Harvey*, 4 Burr. 2484, 2489, 98 Eng. Rep. 302, 305 (K. B. 1769); *King* v. *Purnell*, 1 Black. 37, 42, 96 Eng. Rep. 20, 23 (K. B. 1748); *King* v. *Cornelius*, 2 Str. 1210, 1211, 93 Eng. Rep. 1133, 1134 (K. B. 1744); *Queen* v. *Mead*, 2 LD. Raym. 927, 92 Eng. Rep. 119 (K. B. 1703); *King* v. *Worsenham*, 1 LD. Raym. 705, 91 Eng. Rep. 1370 (K. B. 1701). And this Court has noted that, for generations before the framing, "one cardinal rule of the court of chancery [wa]s never to decree a discovery which might tend to convict the party of a crime." *Boyd* v. *United States*, 116 U. S. 616, 631 (1886). See also *Counselman* v. *Hitchcock*, 142 U. S. 547, 563–564 (1892) ("It is an ancient principle of the law of evidence, that a witness shall not be compelled, in any proceeding, to make

---

[2] Further, it appears that the phrases "gives evidence" and "furnishes evidence" were not simply descriptions of the act of providing testimony. For example, in *King* v. *Purnell*, 1 Black. 37, 96 Eng. Rep. 20 (K. B. 1748), the phrase "furnish evidence" is repeatedly used to refer to the compelled production of books, records, and archives in response to a government request. *Id.*, at 40, 41, 42, 96 Eng. Rep., at 21, 22, 23. See also, *e. g., King* v. *Cornelius*, 2 Str. 1210, 1211, 93 Eng. Rep. 1133, 1134 (K. B. 1744) (compelling discovery of books "is in effect obliging a defendant . . . to furnish evidence against himself"); 1 T. Cunningham, New and Complete Law-Dictionary (2d ed. 1771) (evidence "signifies generally all proof, be it testimony of men, records or writings"); 1 G. Jacob, The Law-Dictionary (T. Tomlins ed. 1797) (defining "evidence" as "[p]roof by testimony of witnesses, on oath; or by writings or records").

disclosures or to give testimony which will tend to criminate him or subject him to fines, penalties or forfeitures").

Against this common-law backdrop, the privilege against self-incrimination was enshrined in the Virginia Declaration of Rights in 1776. See Moglen, The Privilege in British North America: The Colonial Period to the Fifth Amendment, in The Privilege against Self-Incrimination: Its Origins and Development 133–134 (R. Helmholz et al. eds. 1997). That document provided that no one may "be compelled to give evidence against himself." Virginia Declaration of Rights § 8 (1776), in 1 The Bill of Rights: A Documentary History 235 (B. Schwartz ed. 1971). Following Virginia's lead, seven of the other original States included specific provisions in their Constitutions granting a right against compulsion "to give evidence" or "to furnish evidence." See Pennsylvania Declaration of Rights, Art. IX (1776) ("give"), id., at 265; Delaware Declaration of Rights § 15 (1776) ("give"), id., at 278; Maryland Declaration of Rights, Art. XX (1776) ("give"), id., at 282; North Carolina Declaration of Rights, Art. VII (1776) ("give"), id., at 287; Vermont Declaration of Rights, Ch. I, Art. X (1777) ("give"), id., at 323; Massachusetts Declaration of Rights, Pt. 1, Art. XII (1780) ("furnish"), id., at 342; New Hampshire Bill of Rights, Art. XV (1783) ("furnish"), id., at 377. And during ratification of the Federal Constitution, the four States that proposed bills of rights put forward draft proposals employing similar wording for a federal constitutional provision guaranteeing the right against compelled self-incrimination. Each of the proposals broadly sought to protect a citizen from "be[ing] compelled to give evidence against himself." Virginia Proposal (June 27, 1788), 2 id., at 841; New York Proposed Amendments (July 26, 1788), id., at 913; North Carolina Proposed Declaration of Rights (Aug. 1, 1788), id., at 967; Rhode Island Proposal (May 29, 1790) (same suggestion made following the drafting of the Fifth Amendment), in N. Cogan, The Complete Bill of Rights 327 (1997). See also,

*e. g.,* The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents (Dec. 13, 1787) (same suggestion), in 2 Schwartz, *supra,* at 665; 2 Debates on the Federal Constitution 111 (J. Elliot 2d ed. 1854) (Mr. Holmes, Mass., Jan. 30, 1788) (objecting that nothing prohibits compelling a person "to furnish evidence against himself"). Similarly worded proposals to protect against compelling a person "to furnish evidence" against himself came from prominent voices outside the conventions. See The Federal Farmer No. 6 (1787), in Cogan, *supra,* at 333; Letter of Brutus, No. 2 (1788), in 1 Schwartz, *supra,* at 508.

In response to such calls, James Madison penned the Fifth Amendment. In so doing, Madison substituted the phrase "to be a witness" for the proposed language "to give evidence" and "to furnish evidence." But it seems likely that Madison's phrasing was synonymous with that of the proposals. The definitions of the word "witness" and the background history of the privilege against self-incrimination, both discussed above, support this view. And this may explain why Madison's unique phrasing—phrasing that none of the proposals had suggested—apparently attracted no attention, much less opposition, in Congress, the state legislatures that ratified the Bill of Rights, or anywhere else. See 3 W. LaFave, J. Israel, & N. King, Criminal Procedure 290–291 (2d ed. 1999). In fact, the only Member of the First Congress to address self-incrimination during the debates on the Bill of Rights treated the phrases as synonymous, restating Madison's formulation as a ban on forcing one "to give evidence against himself." 1 Annals of Cong. 753–754 (J. Gales ed. 1834) (statement of Rep. Laurance).[3]

---

[3] Representative Laurance was no stranger to the Self-Incrimination Clause; he was responsible for the limiting phrase "in any criminal case," which was added to the Clause without any recorded opposition. See L. Levy, Origins of the Fifth Amendment, The Right Against Self-Incrimination 424–427 (1968). In support of this suggestion, Laurance

In addition, a broad definition of the term "witness"—one who gives evidence—is consistent with the same term (albeit in plural form) in the Sixth Amendment's Compulsory Process Clause.[4] That Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." Soon after the adoption of the Bill of Rights, Chief Justice Marshall had occasion to interpret the Compulsory Process Clause while presiding over the treason trial of Aaron Burr. *United States* v. *Burr*, 25 F. Cas. 30 (No. 14,692d) (CC Va. 1807). Burr moved for the issuance of a subpoena *duces tecum* to obtain from President Jefferson a letter that was said to incriminate Burr. The Government objected, arguing that compulsory process under the Sixth Amendment permits a defendant to secure a sub-

---

noted that, absent such a restriction, the Fifth Amendment was "a general declaration, in some degree contrary to laws passed." 1 Annals of Cong. 753 (J. Gales ed. 1834). Two prominent commentators have suggested that "laws passed" likely refers to §15 of the Judiciary Act of 1789 (then in the process of passage). See Levy, *supra*, at 425–426; Moglen, The Privilege in British North America: The Colonial Period to the Fifth Amendment, in The Privilege against Self-Incrimination: Its Origins and Development 258, n. 109 (R. Helmholz et al. eds. 1997). Section 15 provided that federal courts "shall have power in the trial of actions at law . . . to require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, in cases and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery." Judiciary Act of 1789, 1 Stat. 82. Section 15's grant of power to compel discovery in civil cases would have been inconsistent with an unrestricted Self-Incrimination Clause, but only if the term "witness" in that Clause included persons who provide such physical evidence as "books" and "writings." Laurance's assertion thus suggests that the Framers believed the Self-Incrimination Clause offered protection against such compelled production.

[4] A broad view of the term "witness" in the compulsory process context dates back at least to the beginning of the 18th century. See Act of May 31, 1718, ch. 236, §4, 1 Laws of Pennsylvania 112 (J. Bioren ed. 1810) (speaking of witnesses "be[ing] admitted to [be] depose[d], *or* give any manner of evidence" (emphasis added)).

poena *ad testificandum,* but not a subpoena *duces tecum.*
*Id.,* at 34. The Chief Justice dismissed the argument, hold-
ing that the right to compulsory process includes the right
to secure papers—in addition to testimony—material to the
defense. *Id.,* at 34–35. This Court has subsequently ex-
pressed agreement with this view of the Sixth Amendment.
See *United States* v. *Nixon,* 418 U. S. 683, 711 (1974). Al-
though none of our opinions has focused upon the precise
language or history of the Compulsory Process Clause, a
narrow definition of the term "witness" as a person who
testifies seems incompatible with *Burr*'s holding. And if
the term "witnesses" in the Compulsory Process Clause has
an encompassing meaning, this provides reason to believe
that the term "witness" in the Self-Incrimination Clause
has the same broad meaning. Yet this Court's recent Fifth
Amendment act-of-production cases implicitly rest upon an
assumption that this term has different meanings in ad-
joining provisions of the Bill of Rights.[5]

## II

This Court has not always taken the approach to the Fifth
Amendment that we follow today. The first case interpret-
ing the Self-Incrimination Clause—*Boyd* v. *United States*—
was decided, though not explicitly, in accordance with the
understanding that "witness" means one who gives evidence.
In *Boyd,* this Court unanimously held that the Fifth Amend-
ment protects a defendant against compelled production
of books and papers. 116 U. S., at 634–635; *id.,* at 638–639
(Miller, J., concurring in judgment). And the Court linked
its interpretation of the Fifth Amendment to the common-

---

[5] Accepting the definition of "witness" as one who gives or furnishes
evidence would also be compatible with my previous call for a reconsid-
eration of the phrase "witnesses against him" in the Confrontation Clause
of the Sixth Amendment. See *White* v. *Illinois,* 502 U. S. 346, 365 (1992)
(opinion concurring in part and concurring in judgment).

law understanding of the self-incrimination privilege. *Id.*, at 631–632.

But this Court's decision in *Fisher* v. *United States*, 425 U. S. 391 (1976), rejected this understanding, permitting the Government to force a person to furnish incriminating physical evidence and protecting only the "testimonial" aspects of that transfer. *Id.*, at 408. In so doing, *Fisher* not only failed to examine the historical backdrop to the Fifth Amendment, it also required—as illustrated by extended discussion in the opinions below in this case—a difficult parsing of the act of responding to a subpoena *duces tecum.*

None of the parties in this case has asked us to depart from *Fisher*, but in light of the historical evidence that the Self-Incrimination Clause may have a broader reach than *Fisher* holds, I remain open to a reconsideration of that decision and its progeny in a proper case.[6]

---

[6] To hold that the Government may not compel a person to produce incriminating evidence (absent an appropriate grant of immunity) does not necessarily answer the question whether (and, if so, when) the Government may secure that same evidence through a search or seizure. The lawfulness of such actions, however, would be measured by the Fourth Amendment rather than the Fifth.