# United States Court of Appeals

## For the First Circuit

No. 10-2009

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY C. HARRIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Torruella, Boudin and Dyk,*

Circuit Judges.

Kathleen J. Hill, by appointment of the court, with whom Law Office of Kathleen J. Hill was on brief for appellant.
Anthony C. Harris on brief pro se.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief for appellee.

October 14, 2011

---

*Of the Federal Circuit, sitting by designation

**BOUDIN**, <u>Circuit Judge</u>.  Anthony Harris now appeals from his conviction on five counts under the Criminal Code for his participation in an armed robbery of the Hannaford Supermarket ("Hannaford") in Dover, N.H.  Because Harris argues <u>inter alia</u> that the evidence against him was insufficient, we begin with a summary of evidence at trial taken in the light most favorable to the government.  <u>United States</u> v. <u>Luna</u>, 649 F.3d 91, 96 n.2 (1st Cir. 2011).

On September 23, 2008, Orlando Matos proposed a robbery of the Hannaford to his brother-in-law, Thomas Peterson, and to Harris, who was Peterson's friend.  All three agreed to a plan to rob the Hannaford.  Matos and Harris were to provide guns (respectively, a .380 caliber revolver and a stolen .25 caliber hand gun), Harris was to furnish and drive the get-away car, and the three men were to divide the proceeds equally.

The next night, the conspirators twice scouted the Hannaford.  During the second trip and about an hour before the robbery, Harris entered and checked out the store, purchased some gloves and was caught on its surveillance camera wearing a distinctive New York Yankees hat.  After Harris described the inside of the store to Matos and Peterson, the conspirators retrieved the truck they had left in a nearby apartment complex to use as the get-away car.

At 10:47 p.m. Matos and Peterson entered the Hannaford while Harris waited in the truck. While Matos held employees and customers at gunpoint and took their money, Peterson took about $4,700 from the store's cash office. Fleeing to the truck, which Harris had kept running, Peterson dropped his cell phone. Shortly thereafter, the three men switched to a car owned by Harris' girlfriend and drove to a hotel in Massachusetts where they split the money, receiving about $1,700 each.

Matos and Peterson eventually moved to the Wyndham Hotel in Andover, Massachusetts. Harris departed for New Hampshire, expecting to return in a few days. In the meantime, police entered the hotel room and found money from the robbery, a case belonging to Harris that the conspirators used to hold the robbery money, the two guns, Harris' distinctive Yankees hat which Peterson had borrowed, and stationery on which Matos had written Harris' cell phone number. When Dover police were notified of this trove, they set up a voluntary interview with Harris on October 6, 2008 (the "October 2008 interview").

At the interview, Harris admitted to knowing Peterson, to owning a multi-colored Yankee hat like that recovered from the Wyndham, and to buying gloves at the Hannaford on the night of the robbery. The interview ended when Harris refused the police's request for a DNA sample. In January 2009, the Dover police arrested Harris for his participation in the robbery.

Harris was indicted on February 4, 2009, on four counts relating to the robbery, arraigned, and then made the subject of a superceding indictment; the latter added three counts relating to the Hannaford robbery and two more (later withdrawn by the government and so irrelevant here) relating to a separate robbery.[1] Harris was arraigned on this new indictment on August 28, 2009. He was tried in a week-long trial beginning September 1, 2009.

At the trial, Matos testified for the government confirming Harris' planning and participation in the robbery. The government also offered the surveillance video and various telephone records linking Harris to the robbery and to Matos and Peterson. For example, records showed calls to Peterson's girlfriend from Harris' phone after the robbery, presumably because Peterson borrowed the phone, having dropped his own at the scene. It also showed that Harris called Peterson seven minutes before the robbery, seemingly to test a warning signal that the former could use to alert the latter.

The jury convicted Harris on counts 1-4 (the original robbery counts, use of a firearm and the felon in possession

---

[1]The counts relating to the Hannaford robbery were for conspiracy to commit robbery, 18 U.S.C. § 1951 (count 1); aiding and abetting robbery, id. (count 2); use of a firearm during and in relation to a crime of violence, id. § 924(c)(1)(A) (count 3); possession of a firearm by a convicted felon, id. § 922(g)(1) (count 4); possession of a stolen firearm, id. § 922(j) (count 7); transporting a stolen firearm, id. § 922(i) (count 8); and transporting a stolen motor vehicle, id. § 2312 (count 9).

counts) and count 7 (possessing a stolen firearm), acquitting him on the remaining two (counts 8 and 9).  On August 2, 2010, Harris was sentenced to 264 months.  Harris now presents a cornucopia of challenges to his conviction.  We take them in order of their place in the chronology of the district court proceedings.

Harris' Competency.  In February 2009, the district court, at the request of Harris' first counsel who was investigating an insanity defense, ordered a psychiatric evaluation as to whether Harris was competent to stand trial.  After the examination, a forensic psychologist's report was filed concluding that Harris was competent to stand trial.  Harris now argues that the district court should have held a formal hearing--preferably prior to his arraignment, where the court also should have required him to plead personally.

No request for a formal hearing was made in the district court, and, forfeiture aside, there was no error.  Absent unusual circumstances, a judge is not obliged to hold a formal hearing after an expert affirms the defendant's competency, unless someone or some circumstance provides good reason for doing so.  United States v. Lebron, 76 F.3d 29, 32 (1st Cir.), cert. denied, 518 U.S. 1011 (1996).  Here, Harris' original defense counsel sought no hearing and Harris' second defense counsel saw so little basis for having the examination that he claimed that the examination should not have stopped the speedy trial clock.

As for the judge, when Harris tried to resurrect the issue of his competency at sentencing, the district judge responded to Harris: "I observed you throughout the trial. I've observed you in many pretrial proceedings. . . . You're an intelligent person who understands your surroundings and exercises judgment. There's no question you were able to understand the proceedings and assist your counsel at trial." Cf. United States v. Pryor, 960 F.2d 1, 2 (1st Cir. 1992).

Turning to counsel's entry of the plea at the original arraignment, it is perhaps "preferable that defendant plead personally," 1A Wright & Leipold, Federal Practice and Procedure: Criminal § 161, at 128-29 (4th ed. 2008). But the not guilty plea at the arraignment represented Harris' continuing position, and anyway he was ultimately re-indicted and re-arraigned and makes no complaint about the new arraignment. Nor does Harris even hint at any prejudice from having counsel answer for him in the original arraignment.

Speedy Trial Act. Harris (in his supplemental pro se brief) argues that the district court erred in denying a defense motion to dismiss under the Speedy Trial Act, 18 U.S.C. § 3161(c)(1), based on the delay between his indictment on February 4, 2009 and trial beginning September 1, 2009. The Speedy Trial Act requires that trial commence within 70 days of the indictment. Id.

The district court excluded for speedy trial purposes the time (1) between February 4 and April 30, 2009, for Harris' competency exam, 18 U.S.C. § 3161(h)(1)(A), and (2) between March 20 and July 10, 2009 for two continuances of trial granted for then co-defendant Peterson, id. § 3161(h)(6) & (7), leaving only 53 countable days between July 10 and September 1 when Harris' trial began--well within the 70 days required by the Speedy Trial Act, id. § 3161(c)(1). See United States v. Harris, 2009 WL 2824729, No. 09-cr-33-JL (D.N.H. Aug. 31, 2009).

Harris says that the competency evaluation should not have been ordered. But Harris' counsel had sought such a psychiatric evaluation because his interactions with Harris indicated to him Harris may have had a medical condition affecting his understanding. Even though this was in aid of a possible defense, counsel's request gave the court "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent." 18 U.S.C. § 4241(a).

Harris also argues that the continuances should not have been granted, but the grounds presented by co-defendant's counsel--the need for "reasonable time necessary for effective preparation," 18 U.S.C. § 3161(h)(7)(B)(iv)--are ones we have routinely held sufficient to grant continuances and exclude the time under the Speedy Trial Act. See, e.g., United States v.

-7-

Joost, 133 F.3d 125, 130 (1st Cir.), cert. denied, 523 U.S. 1087 (1998).

Lastly Harris' pro se submission says that had the judge not excluded more than 30 days for the competency examination, cf. 18 U.S.C. § 4247(b), there would be no Speedy Trial Act violation. Defense counsel's own continuances, which we have readily sustained, overlap with much of the competency inquiry; and even if only 30 days were properly excluded for the latter inquiry, the trial began within the 70 days allowed for all unexcluded delay.

Harris' counsel in this court makes a different argument, namely, that Harris was entitled to defer the trial for 30 days after new counts were added and that the trial judge erred in accepting a waiver of this asserted right without adequately assuring that Harris' rights were adequately protected. The trial judge assumed Harris had a right to such postponement, but see United States v. Rojas-Contreras, 474 U.S. 231, 236-37 (1985), severed the new counts for a later trial and then--after Harris and his counsel conferred--accepted Harris' waiver following a lengthy colloquy and a signed waiver by Harris.

Harris' counsel makes no serious effort to show that the waiver colloquy was inadequate but argues primarily that trial counsel could not adequately prepare for the new counts without more time. However, the government dismissed before the trial the two new counts that related to a different robbery, and the only

new count resulting in a conviction rested on the fact that Harris' firearm had been stolen. Anyway, as we later explain, what is effectively an attack on counsel's competence is premature.

Refusal to provide DNA evidence. At trial, a police witness testified, in response to a question by defense counsel, that Harris in his pre-arrest voluntary interview had declined to provide DNA evidence. Harris' brief says that this violated Harris' Fifth Amendment right not to incriminate himself, Griffin v. California, 380 U.S. 609 (1965). The brief also argues that a cautionary jury instruction warning the jury about inferences to be drawn from the refusal was incomplete, prejudicial, and given too late.

Ordinarily, a party who elicits evidence would waive any claim that its admission was error, United States v. Lizardo, 445 F.3d 73, 84 (1st Cir.), cert. denied, 549 U.S. 1007 (2006); United States v. Vachon, 869 F.2d 653, 658 (1st Cir. 1989). Still, on direct, the government avoided bringing out Harris' refusal but later argued that defense counsel by further questions had opened the door to the issue. When the judge without ruling on this claim offered defense counsel the alternative of bring out the DNA refusal; counsel might have thought that he now had no choice.

However, Griffin aimed to protect a constitutional right not to testify; but the Fifth Amendment does not prevent a defendant from being compelled to provide blood and fingerprints,

-9-

and to stand in a lineup.  E.g., United States v. Hubbell, 530 U.S. 27, 35 (2000); United States v. Wade, 388 U.S. 218, 221-23 (1967). And unlike Doyle v. Ohio, 426 U.S. 610, 619 (1976), defendant could not have been misled into silence by Miranda warnings since he was not under arrest and nothing indicates that Miranda warnings were given.

Whether a refusal to provide forensic evidence would permit a rational inference of guilt depends (like flight) on the circumstances, and evidence of such a refusal might well be impermissible under some circumstances.  Cf. United States v. Moreno, 233 F.3d 937, 940-41 (7th Cir. 2000).  However, Harris' opening argument had suggested that the government's case was flawed because of a lack of DNA evidence, and the government was entitled to respond that Harris had declined to provide it.  United States v. McNatt, 931 F.2d 251, 256-58 (4th Cir. 1991), cert. denied, 502 U.S. 1035 (1992).  Further, the judge cautioned the jury as to drawing an adverse inference.

As for the instruction, the judge advised the jury, without objection, as follows:

> A person has no legal obligation to voluntarily provide information or things requested by investigators.  There are many reasons why such a person might decline to provide such information or things.  You should not conclude or infer that the defendant was predisposed to commit criminal acts because of his alleged refusal to voluntarily provide such information or things. You may only consider the evidence

presented on this issue within the context of the particular circumstances of this case.

Harris argues that this did not clearly forbid an inference of guilt since it referred in the third sentence to a narrower and more specific inference. It would have been clearer to mention inference of guilt as well, but that was strongly suggested by the third sentence. Taking the instruction as a whole and the evidence against Harris, there is no serious chance that the alteration proposed--or giving the instruction earlier--would have altered the outcome and so there was no plain error. United States v. Olano, 507 U.S. 725, 733-35 (1993).

Sufficiency of the evidence. Harris appeals from the denial of his motion for judgment of acquittal made at trial. Fed R. Crim. P. 29. Although our review is de novo, we examine the evidence in the light most favorable to the verdict and need only conclude that the evidence would permit a rational fact-finder to conclude beyond a reasonable doubt that defendant committed the charged crime. United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009).

The insufficiency claim here is hopeless. The government presented Matos, who engineered the robbery, to give a complete account of the robbery, its planning and aftermath, and Harris' role. Matos had a motive to curry favor with the government, but this was brought out on cross-examination and reinforced by an instruction. The jury, having heard Matos testify and be

-11-

questioned about supposed inconsistencies, chose to credit his testimony, as it was entitled to do. United States v. Shelton, 490 F.3d 74, 79 (1st Cir.), cert. denied, 552 U.S. 894 (2007).

Much worse for Harris, ample hard evidence corroborated Harris' involvement. The video and his admission showed him to be in the store shortly before the robbery, telephone records confirmed exchanges with Matos and Peterson, Harris' case, hat and cellphone number were in the Wyndham with the other two robbers, and calls from Harris' phone were made to Peterson's girlfriend after Peterson dropped his phone at the robbery.

Further, there was nothing significant to weight on the other side of the scale. Harris offered little defense beyond pointing to Matos' motive to lie and to the lack of DNA evidence, but the former was offset by the corroborative hard evidence and the latter by Harris' own refusal to provide DNA. On appeal, Harris does not even explain what reasonable doubt a jury could have had, given the evidence on the government's side.

Harris' counsel and alleged government wrongdoing. In his appellate brief, Harris makes two further claims: that Harris' trial counsel provided inadequate representation and that the government used false testimony and violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963). Neither claim was raised in the district court, and the record provides no adequate basis for us to consider either of them.

The claims against counsel are threefold but only one of them appears significant. Having to discredit Matos at almost any cost, defense counsel used in cross-examination an agreed statement of facts used in Matos' own plea proceedings. The agreed statement contained statements summarizing what Harris' girlfriend would have said about the involvement of all three robbers. Given that the agreed statement was given to the jury, this might well seem to call for explanation by trial counsel.[2]

Part of the explanation appears to be that, at the time, both the government and Harris expected that the girlfriend would testify, so her prior statement would not necessarily have mattered. But we cannot know for sure how counsel would justify his decision on this or either of the other two choices now criticized on appeal. Thus, here as in most cases the defendant's remedy is a collateral attack proceedings. United States v. Wyatt, 561 F.3d 49, 52 (1st Cir.), cert. denied 129 S. Ct. 2818 (2009); United States v. Torres-Rosario, 447 F.3d 61, 64 (1st Cir. 2006).

Further, even if counsel made an error severe enough to satisfy the Strickland standard, Strickland v. Washington, 466 U.S. 668, 687 (1984), Harris would still have to persuade a habeas court

---

[2]Although other portions of the statement were used by Harris in cross-examination, the government's brief says that neither Harris nor the government brought the girlfriend's statements to the attention of the jury during the trial. Harris filed no reply brief and we have found no other indication to the contrary. Just what, if anything, was later read by the jury is unclear.

that counsel's mistake had likely altered the outcome of the trial. Given the other evidence against Harris, it might be quite difficult to show that any references to the girlfriend's comments--a subject not even adverted to in the government's closing--likely altered the outcome.

Even less need be said about charges that the government used false testimony or withheld exculpatory evidence. The government has provided colorable responses to the several charges, which are themselves far from self-evident; but there is no possible way either to test or sustain them on the present record, none of the charges having been aired in the district court. If that omission is not fatal, Harris may pursue them on collateral attack.

We have considered several other claims made by Harris' counsel and by Harris himself in his pro se brief but none requires separate discussion. Although the brief filed by Harris' counsel is energetic and extensive, nothing persuades us that any prejudicial error was committed or that Harris was wrongly convicted.

Affirmed.