[807 NE2d 259, 775 NYS2d 210]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHRISTOPHER SLAVIN, Appellant.

Argued January 8, 2004; decided February 17, 2004

## POINTS OF COUNSEL

*Robert J. Del Col,* Huntington, *David Besso* and *Stephen Preziosi* for appellant. I. Can the People obtain, pursuant to CPL 240.40, and thereafter admit evidence of tattoos, not relevant to establish physical appearance, physical condition or identity, but rather for their "testimonial value" and in a "communicative context"? (*Matter of Abe A.,* 56 NY2d 288; *People v Herr,* 203 AD2d 927.) II. Does the issuance of an order that permits the gathering of corporeal evidence only relevant for its testimonial value and insights into the purported "subjective thought process" of an appellant violate the Fifth Amendment protection against self-incrimination? (*Saccente v Toterhi,* 35 AD2d 692; *People v Alpern,* 217 AD2d 853; *People v Baez,* 131 AD2d 687; *Schmerber v California,* 384 US 757; *People v Hager,* 69 NY2d 141; *Gilbert v California,* 388 US 263; *Counselman v Hitchcock,* 142 US 547; *People v Berg,* 92 NY2d 701; *People v Segal,* 78 AD2d 523.) III. Should the trial court, before permitting the introduction of such inflammatory and prejudicial evidence and the testimony of an "expert on hate groups and white supremacy," have conducted a hearing and followed the criteria set forth in *People v Molineux* (168 NY 264 [1901]) and *People v Ventimiglia* (52 NY2d 350 [1981]), or in the alternative, established its own procedural safeguard against undue prejudice? (*People v Torres,* 72 AD2d 754; *People v Jones,* 278 AD2d 246; *People v Hudy,* 73 NY2d 40; *People v Siu Wah Tse,* 91 AD2d 350; *People v Hamlin,* 71 NY2d 750; *United States v Yarbrough,* 852 F2d 1522; *People v Burke,* 170 AD2d 1021; *People v Kocyla,* 167 AD2d 938; *People v Ingram,* 71 NY2d 474; *People v Alvino,* 71 NY2d 233.) IV. Did the prosecutorial misconduct that occurred, both pretrial and at trial, rise to the level necessary to dismiss the indictment or warrant a new trial for appellant? (*People v Rodney,* 85 NY2d 289; *Pennsylvania v Muniz,* 496 US 582; *People v Huston,* 88 NY2d 400; *Schmerber v California,* 384 US 757; *Gilbert v California,* 388 US 263; *People v Pelchat,* 62 NY2d 97; *People v Di Falco,* 44 NY2d 482; *People v Darby,* 75 NY2d 449; *People v Sayavong,* 83 NY2d 702; *People v Wilkins,* 68 NY2d

269.) V. The errors complained of cannot be considered harmless beyond a reasonable doubt and require either dismissal of the indictment or a new trial for appellant. (*People v Contes,* 60 NY2d 620; *Jackson v Virginia,* 443 US 307, 444 US 890; *People v Thompson,* 72 NY2d 410; *People v O'Doherty,* 70 NY2d 479; *People v Colp,* 147 AD2d 964; *People v Dunleavy,* 41 AD2d 717; *People v Potwora,* 44 AD2d 207; *People v Rosario,* 127 AD2d 209; *People v Gaimari,* 176 NY 84; *People v Garafolo,* 44 AD2d 86.)

*Thomas J. Spota, District Attorney,* Riverhead (*Michael Blakey* of counsel), for respondent. I. Arrest photographs showing appellant's tattoos were lawfully obtained and used to prove intent and motive. (*People v Rodriguez,* 64 NY2d 738; *R.A.V. v City of St. Paul, Minn.,* 505 US 377; *Dawson v Delaware,* 503 US 159; *Wisconsin v Mitchell,* 508 US 476; *People v O'Sullivan,* 96 Misc 2d 52; *Texas v Johnson,* 491 US 397; *Bery v City of New York,* 97 F3d 689; *Yurkew v Sinclair,* 495 F Supp 1248; *Barclay v Florida,* 463 US 939; *Katz v United States,* 389 US 347; *People v Scott,* 79 NY2d 474.) II. No prosecutorial misconduct occurred. (*People v Rodney,* 85 NY2d 289; *People v Colavito,* 87 NY2d 423; *People v Brewster,* 63 NY2d 419; *Virag v Hynes,* 54 NY2d 437; *People v Avant,* 33 NY2d 265; *People v Oakley,* 28 NY2d 309; *People v Kuss,* 32 NY2d 436; *People v Neilson,* 115 AD2d 972; *People v Reimann,* 266 App Div 505; *People v Wood,* 66 NY2d 374.) III. Guilt was proved beyond a reasonable doubt and harmless error analysis is available. (*People v Contes,* 60 NY2d 620; *People v Cintron,* 95 NY2d 329; *People v Benzinger,* 36 NY2d 29; *People v Crimmins,* 36 NY2d 230; *Arizona v Fulminante,* 499 US 279; *People v Carmona,* 82 NY2d 603; *Matter of Gladys H.,* 235 AD2d 841; *People v Perez,* 160 AD2d 637, 76 NY2d 793; *People v Figueroa,* 158 AD2d 308; *People v McCullough,* 141 AD2d 856.)

### OPINION OF THE COURT

READ, J.

We are called upon to decide whether the trial court violated defendant's Fifth Amendment privilege against self-incrimination by allowing the People to introduce photographs of upper body tattoos, taken over defendant's objection, as evidence of motive for committing a hate crime. We conclude that defendant was not "compelled . . . to be a witness against himself" (US Const 5th Amend) within the meaning of the privilege. The tattoos were physical characteristics, not testimony

forced from his mouth (see Schmerber v California, 384 US 757, 764-765 [1966]; People v Berg, 92 NY2d 701, 704 [1999]). However much the tattoos may have reflected defendant's inner thoughts, the People did not compel him to create them in the first place (compare United States v Hubbell, 530 US 27, 35-36 [2000]).

## I.

In the early morning hours of September 17, 2000, defendant and an accomplice lured two Mexican "day laborers" into a car with the false promise of work, and drove them to an abandoned building in Suffolk County on Long Island. During the drive, defendant asked the two men whether they were Mexicans. Almost immediately after arriving at the building, defendant and his accomplice launched an unprovoked and brutal attack on their two unsuspecting victims. Defendant struck both men in the head with a metal post-hole digger, while his accomplice stabbed one of them several times. The two victims, one of whom was bleeding profusely, contrived to escape their assailants by fleeing onto the Long Island Expressway. There, a passing motorist rescued them.

The extensive police investigation that followed the attack quickly focused on defendant and his accomplice. Defendant's accomplice turned himself in about a month after the crime. Three weeks later, defendant, accompanied by counsel, surrendered at the District Attorney's office. Counsel informed the authorities that defendant would not be making any statements, and rejected the District Attorney's request for "voluntary exemplars." During arrest processing, law enforcement officials—over defendant's objections—took photographs of his various tattoos. Defendant's two victims did not observe the tattoos during the attack.

On the back of defendant's neck, just below his hairline, his skin was tattooed in black with the letters "A.C.A.B." ("All Cops Are Bastards"). On defendant's right upper arm, the letters "F.T.W." ("Fuck The World") were tattooed in red, and the letters "NYHC" ("New York Hard Core" or "New York Hate Corps") were tattooed in black. A tattoo on defendant's right upper chest pictured a Nazi swastika in black, crosscut with a white fist and encircled by the Celtic cross in red and black. The tattoo on defendant's torso above his waistline depicted a cartoonish figure with a large nose, wearing a skullcap and a coat with money protruding from a pocket. This figure was kneeling

with hands raised in supplication at the approach of a skinhead with an outstretched, outsized foot. The skinhead wore "Doc Martin" boots, rolled up pants and red suspenders. Clutching an axe and a square-shaped bottle, his visage was sinister and clownlike, with a protuberant red nose.

Defendant's upper left arm also bore several elaborate tattoos, including an American flag above the Nazi swastika below a cloud; another Celtic cross; a skinhead holding a club and restraining a leashed pit bull wearing a spiked collar; a bald eagle; two lightning bolts, the symbol for the Nazi "SS"; a skinhead wearing suspenders on a bare chest and holding a flaming torch as he stepped upon human skeletal remains; and a tank crushing human skulls as it emerged from a city on fire. The tattoos on defendant's left forearm featured an arrow projecting from a cloud or waterbody; a Viking ship with many shields along its side; and two burly Viking figures, one of which was blowing a horn.

In securing an indictment of defendant, the People presented the arrest photographs of these tattoos to the grand jury. Arguing that his rights under the Fourth, Fifth, and Sixth Amendments had been violated, defendant moved to dismiss the indictment and, failing that, to preclude the use of the photographs at trial. The trial court rejected defendant's motion.

In finding no Fourth Amendment violation, the trial court remarked that it was "hard for [him] to believe that this defendant had a legitimate expectation of privacy during [his arrest] processing, especially one recognized by society, a point [he] does not attempt to argue." He also cited CPL 160.10 (3), which provides that whenever fingerprinting of an arrestee is required or allowed, "the photograph . . . of the arrested person or the defendant, as the case may be, may also be taken." As for defendant's Sixth Amendment claim, the trial court held that arrest processing was not a "critical stage" mandating the presence of counsel.

In rejecting defendant's Fifth Amendment claim, the trial court relied largely on *Schmerber v California* (384 US 757 [1966], *supra*). There, the Supreme Court held that the privilege against self-incrimination protects an "accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature" (*id.* at 761). Accordingly, in *Schmerber* the Court concluded that the compelled withdrawal of blood from a drunk

driving suspect did not violate the privilege because the "blood test evidence, although an incriminating product of compulsion, was neither [the suspect's] testimony nor evidence relating to some communicative act or writing by the [suspect]" (*id.* at 765). Extrapolating from *Schmerber*, the trial court found that defendant's tattoos were not testimonial evidence, but simply physical characteristics, and that the privilege does not bar the introduction of photographs resulting from the compelled exhibit of a suspect's body.

In addition to denying defendant's motion, the trial court also granted the People's motion to take a second set of photographs pursuant to CPL 240.40. This provision vests a trial court with the discretion to order a defendant to provide "non-testimonial evidence," including having to "[p]ose for photographs not involving reenactment of an event" (CPL 240.40 [2] [b] [iv]). The trial court determined that the tattoos were relevant to defendant's motive for committing the charged hate crime of second-degree aggravated harassment. At the time, this provision made it a crime for a person "with intent to harass, annoy, threaten or alarm" to "[s]trike[ ], shove[ ], kick[ ], or otherwise subject[ ] another person to physical contact, or attempt[ ] or threaten[ ] to do the same because of the race[,] color, religion or national origin of such person" (Penal Law § 240.30 [3], as enacted by L 1982, ch 191, § 1).[1]

Before jury selection, defendant moved to preclude the introduction of the second set of photographs, reiterating his objection under the Fifth Amendment and disputing relevancy. The trial court again denied defendant's motion.

At trial, the People introduced the photographs of defendant's tattoos through the testimony of a friend, who identified them as depicting tattoos that he had observed on defendant's body prior to the attack. The People also presented a witness who was qualified as an expert in bias and hate crimes. This expert testified as to the customary meaning of the letters, symbols and pictures represented in defendant's tattoos. The trial court directed the expert not to testify that defendant belonged to or shared the views of any particular group; he also instructed the expert not to offer testimony as to what defendant may have been thinking during the attack. In allowing the expert's testimony, the court again rejected various Fifth Amendment and relevancy arguments raised by defendant.

---

**1.** Penal Law § 240.30 (3) now encompasses a broader range of prohibited conduct (*see* L 2000, ch 107, § 3).

The jury convicted defendant of two counts of attempted second-degree murder; one count of first-degree assault and one count of second-degree assault; and two counts of second-degree aggravated harassment. The Appellate Division affirmed, and a Judge of this Court granted defendant leave to appeal.

## II.

Defendant argues that the photographs were introduced to establish his motive for committing a hate crime by disclosing his subjective thoughts and beliefs on the issue of race. And that, he claims, constituted compelled "testimonial" evidence forbidden by the Fifth Amendment privilege against self-incrimination. We disagree. Although the jurors may have inferred defendant's motive from the existence of the tattoos, the tattoos were not compelled testimony within the scope of the privilege.

As an initial matter, the privilege does not preclude a criminal defendant from being required to exhibit physical characteristics or to provide physical exemplars. Indeed, "a person can be forced to produce 'real or physical evidence' " (*People v Berg*, 92 NY2d at 704, quoting *Schmerber v California*, 384 US at 764). Further, "there is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that may be incriminating" (*United States v Hubbell*, 530 US at 34-35). In the latter situation, the privilege is not violated because " 'the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material' " (*id.* at 35 n 9, quoting *Holt v United States*, 218 US 245, 252-253 [1910]).

There is no doubt that defendant's tattoos were, as the trial court concluded, "physical characteristics." Nor is there any dispute that the People took the photographs of the tattoos over defendant's objections. The issue thus becomes whether the privilege is implicated here because this particular "real or physical evidence" (*Schmerber v California*, 384 US at 764) may have also reflected defendant's thought processes. In this regard, we consider it dispositive that there is no Fifth Amendment protection for the contents of preexisting documents. Indeed, it is a "settled proposition that a person may be required to produce specific documents [in response to a subpoena] even though

they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled' within the meaning of the privilege" (*United States v Hubbell*, 530 US at 35-36).

Thus, the privilege does not necessarily bar compelling the disclosure of evidence that a criminal defendant created voluntarily in the past, even if the evidence betrays "incriminating assertions of fact or belief" (*id.* at 35; *see also United States v Doe*, 465 US 605, 610-611 [1984], citing *Fisher v United States*, 425 US 391 [1976] [privilege does not protect contents of documents created voluntarily]).

Nor, as the dissent implies, does the act-of-production doctrine come into play in this case. This doctrine derives from the distinction drawn by the Supreme Court in *Fisher* between the testimonial aspects of the content of evidence and its production, which "has communicative aspects of its own, wholly aside from . . . content[ ]" (*Fisher v United States*, 425 US at 410). The Court identified those communicative aspects of the act of production as the tacit concession that papers produced in response to a subpoena duces tecum exist; are in the defendant's possession and control; and are those described in the subpoena. Whether a particular production of documents involves a tacit testimonial communication of these facts would "depend on the facts and circumstances of particular cases or classes thereof" (*id.*). In *Fisher* itself, the act of production did not run afoul of the privilege because the Government already knew about the subpoenaed papers' existence and location.

Here, the People obviously knew about defendant's tattoos at the time of his arrest;[2] therefore, defendant was not required to disclose the existence of his tattoos or to describe them. Simply put, defendant was not at any time compelled to "restate, repeat, or affirm the truth of the[ ] contents" of the tattoos (*United States v Doe*, 465 US at 612). Thus, even if requiring

---

**2.** Defense counsel certainly seems to have understood the District Attorney's request for "exemplar evidence" to have been aimed at obtaining photographs of defendant's tattoos. How the authorities learned about defendant's tattoos is not clear from the record before us. Only the tattoo on the back of defendant's neck would have been plainly visible when he was wearing a long-sleeved shirt. The lead detective on the case, however, was a member of Suffolk County Police Department's Bias Crimes Unit and so, at the very least, likely understood what this tattoo (the letters "A.C.A.B.") signified. Further, the People had interviewed several of defendant's former girlfriends during their investigation of the crime.

him to take his shirt off[3] and pose for arrest photographs is considered analogous to the act of production of subpoenaed documents, the People were not relying on defendant's "truth-telling" to discover the existence of his tattoos (*Fisher v United States*, 425 US at 411 ["Under these circumstances . . . 'no constitutional rights are touched. The question is not of testimony but of surrender' "], quoting *In re Harris*, 221 US 274, 279 [1911]).

Nothing that occurred here implicated defendant's privilege against self-incrimination. The People legally took two sets of photographs (initially, during arrest processing; later, by court order) of tattoos that defendant created voluntarily, long before he committed his crime.[4] (His friend testified that defendant had acquired the most recent tattoo at least five years earlier.) The People did not force defendant to reveal his thoughts and beliefs; they presented an expert witness who testified about the customary meaning of the images depicted by defendant's tattoos. The trial court instructed the expert not to opine as to what defendant may have been thinking during the attack.

In sum, the tattoos may have been incriminating in the sense of potentially reflecting defendant's "subjective knowledge or thought processes" (*People v Hager*, 69 NY2d 141, 142 [1987]), but defendant created this evidence of his own accord, without any compulsion from the People. Defendant was therefore not "compelled . . . to be a witness against himself" (US Const 5th Amend) within the meaning of the privilege (*see United States v Hubbell*, 530 US at 35-36; *see also Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984, Y., M.D., P.C. v*

---

**3.** Defendant is pictured wearing trousers in the photographs attached to his motion to preclude and in those photographs admitted into evidence.

**4.** Even if, as the dissent contends, the trial court erroneously authorized the taking of the second set of photographs, defendant suffered no prejudice as a result because neither set of photographs violated his Fifth Amendment privilege. Accordingly, the first set of photographs would have been admissible at trial. Moreover, assuming that the second set of photographs did not fit within the meaning of "non-testimonial evidence" obtainable by court order pursuant to CPL 240.40, "the admissibility of evidence in the face of the Self-Incrimination Clause does not turn on the presence or absence of" statutory authorization (*People v Berg*, 92 NY2d at 706). Indeed, "if evidence is constitutionally permissible, the absence of authorization in a statute does not make it impermissible" (*id.*).

*Kuriansky*, 69 NY2d 232, 242 [1987], *cert denied* 482 US 928 [1987]).[5]

Accordingly, the order of the Appellate Division should be affirmed.

CIPARICK, J. (dissenting in part). Because I believe that by being forced to submit to the photographing of his tattoos, the defendant was compelled to be a witness against himself in violation of his Fifth Amendment privilege against self-incrimination, I respectfully dissent.

The Fifth Amendment protects a person from being "compelled in any criminal case to be a witness against himself" (US Const 5th Amend) and encompasses testimonial or communicative evidence (*see Schmerber v California*, 384 US 757, 761 [1966]). In order to be considered testimonial, "an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information" (*Doe v United States*, 487 US 201, 210 [1988]; *see also People v Berg*, 92 NY2d 701, 704 [1999]). "Evidence is 'testimonial or communicative' when it reveals a person's subjective knowledge or thought processes" (*People v Hager*, 69 NY2d 141, 142 [1987] [citations omitted]). The privilege against self-incrimination seeks, at least in part, "to spare the accused from . . . having to share his thoughts and beliefs with the Government" (*Doe*, 487 US at 213).

Inasmuch as neither of defendant's victims saw his tattoos, the tattoos were not offered for the purpose of identification, but as evidence of motive. It is certainly true that, typically, corporeal evidence falls outside the scope of the Fifth Amendment because a person's physical characteristics are neither testimonial nor communicative. But when, in a case such as this one, corporeal evidence is offered for its testimonial value, the privilege against self-incrimination is clearly implicated. Today the Court ignores that critical distinction.

Typically, "[a] mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the protection of the Fifth Amendment]" (*Gilbert v California*, 388 US 263, 266-267 [1967]; *see also United States v Dionisio*, 410 US 1, 6-7 [1973]). But when "the content of the exemplars was testimonial or communicative matter" (*Gilbert*, 388 US at 267), a handwriting sample will be protected. Similarly, defendant's tattoos were of-

---

5. We also reject defendant's claims under the Fourth and Sixth Amendments (*see Schmerber v California*, 384 US at 765-766, 771-772).

fered here not as identifying characteristics, but for the message they conveyed and to prove defendant's thoughts and state of mind at the time the crimes were committed. It was thus the meaning and content of the tattoos, established through expert testimony, and not the fact that a particularly shaped and colored marking was located on a particular part of defendant's body, that gave this evidence its relevance. Indeed, the People do not argue otherwise.

In being forced to remove his clothing and reveal tattoos that were used as proof of his subjective beliefs, defendant was thus compelled to provide evidence of a testimonial nature. The Court recognizes the communicative quality of defendant's tattoos (majority op at 399), but nonetheless concludes that defendant was not compelled to incriminate himself within the meaning of the Fifth Amendment, relying on a line of Supreme Court cases applicable to subpoenas for documents.

The analogy is dubious at best.[1] Surely the forced strip search of a defendant constitutes a far greater invasion into privacy rights than a subpoena for documents. But even if I were to accept the analogy, still I would conclude that defendant's privilege against self-incrimination was violated. In ruling otherwise, the Court has misunderstood the import of the Supreme Court's relevant precedent.

The Court's reference to the proposition that one may be required to disclose documents that contain incriminating evidence when the individual was not "compelled" to create those documents (*see* majority op at 398-399, quoting *United States v Hubbell*, 530 US 27, 35-36 [2000]; *United States v Doe*, 465 US 605, 610-611 [1984]; *Fisher v United States*, 425 US 391 [1976]) tells only half the story. What the Court fails to recognize is that the content of incriminating documents may nevertheless be privileged if a subpoena forces the defendant to "restate, repeat, or affirm the truth of their contents" (*United States v Doe*, 465 US at 612; *see also Hubbell*, 530 US at 36 n 18), and that the act of production of testimonial evidence can have independent testimonial or communicative significance (*see Fisher*, 425 US at 410), such as when, by producing the documents, "the witness would admit that the papers existed, were in his possession or control, and were authentic" (*Hubbell*, 530 US at 36-37 n 19

---

**1.** As the Supreme Court has often stated, "one of the several purposes served by the constitutional privilege against compelled testimonial self-incrimination is that of protecting personal privacy" (*see e.g. Fisher v United States*, 425 US 391, 399 [1976]).

[citations omitted]). If such an admission is itself incriminating, its compulsion will violate the Fifth Amendment. The Court's conclusion that the privilege does not bar compelling the production of evidence that a criminal defendant voluntarily created in the past (majority op at 399) thus mischaracterizes the holding of *Hubbell*.

Here, defendant's tattoos were used to demonstrate his current beliefs or state of mind. Since they were offered for the purpose of proving defendant's motive for the attacks, the tattoos were being used to show his "subjective knowledge or thought processes" (*Hager*, 69 NY2d at 142), and constituted testimonial evidence. Although defendant was not compelled to ink these images onto his skin, he was forced at the time of arrest to reveal his tattoos, obtained years before, which—in requiring him to impliedly affirm and adopt the message they conveyed as reflective of his *current* racist beliefs—compelled him to perform an act with independent testimonial significance.

I cannot agree, moreover, with the Court's conclusion that the photographs originally taken of defendant's tattoos upon his arrest were in any event permitted because they were obtained during normal arrest processing. The record reflects that all of defendant's tattoos—with the exception of one on the back of his neck (the initials "A.C.A.B.," likely meaningless to most people)—were located on areas of defendant's body covered by his everyday clothing. "[W]hat he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected" (*Katz v United States*, 389 US 347, 351 [1967]).

Nor, despite the People's contention, could these purported "arrest photographs" be justified as part of the routine booking procedures to which all arrestees are subject (*see* CPL 160.10 [3]). Typical arrest photographs consist of front and side view "mug shots" of the face, necessary for the administrative purpose of identifying those in the custody of the police. Here, defendant, over his objection, was required to remove articles of his clothing to allow authorities to photograph his naked torso. We have never held that strip searches are, without more, automatically justified by a lawful arrest or permitted as a routine part of the booking process (*see People v More*, 97 NY2d

209 [2002]).[2] Nor could we (*see e.g. Weber v Dell*, 804 F2d 796 [2d Cir 1986], *cert denied sub nom. County of Monroe v Weber*, 483 US 1020 [1987]). It is neither administratively necessary nor routine for the police to take such photographs which, here, were clearly taken as part of an investigative search for evidence.

In any event, the photographs actually introduced at defendant's trial were those secured pursuant to the CPL 240.40 order issued by County Court, not those taken at the time of his arrest. But these, too, were unlawfully obtained. The statute provides that "[u]pon motion of the prosecutor, and subject to constitutional limitation, the court . . . may order the defendant to provide non-testimonial evidence" (CPL 240.40 [2] [b]). CPL 240.40 could not authorize the photographs of defendant's tattoos both because they were testimonial in nature, revealing his subjective thoughts, and because they violated defendant's Fifth Amendment privilege against self-incrimination. Inasmuch as the Court concedes that defendant's tattoos reflected his subjective knowledge or thought processes (*see* majority op at 400), it is hard to imagine how the Court can escape the conclusion that the testimonial photographs admitted at defendant's trial were obtained in violation of the statute pursuant to which they were secured and therefore had to have been suppressed.

Defendant's heinous crimes and despicable beliefs do not exempt him from the protections of the Constitution or the law. The admission at defendant's trial of evidence of his tattoos, obtained by compulsion, to demonstrate his subjective beliefs and thought processes plainly violated his privilege against self-incrimination. Nevertheless, inasmuch as proof of defendant's guilt of attempted murder and assault was overwhelming, the

---

**2.** The Court notes that County Court rejected defendant's Sixth Amendment claim because "arrest processing was not a 'critical stage' mandating the presence of counsel" (majority op at 396). But since arrest processing does not permit compelled self-incrimination, forcing defendant to strip in an effort to gain testimonial evidence was not part of any routine booking procedure constituting a noncritical stage. In any event, a defendant only has no right to counsel at a noncritical stage in the absence of a request (*see People v Shaw*, 72 NY2d 1032, 1033 [1988]). Here, defendant's retained counsel had already entered the case and informed the prosecutor that defendant would make no statements and that defendant specifically rejected the People's request that he provide "voluntary exemplars," including photographs of his body. After counsel left, however, defendant, over his objection, was stripped and the tattoos on his body were photographed. Testimonial evidence of defendant's tattoos was thus obtained in violation of defendant's actually invoked right to counsel.

error with respect to his conviction of those felony charges was harmless beyond a reasonable doubt (*see People v Crimmins*, 36 NY2d 230, 237 [1975]). But because the proof that defendant's actions were motivated by the ethnicity of his victims was, in the absence of evidence of his tattoos, minimal, I would reverse his conviction of aggravated harassment in the second degree.

Judges G.B. SMITH, ROSENBLATT and GRAFFEO concur with Judge READ; Judge CIPARICK dissents in part and votes to modify in a separate opinion in which Chief Judge KAYE concurs; Judge R.S. SMITH taking no part.

Order affirmed.