UNITED STATES of America

v.

Louis PAGNOTTI, III.

No. 3:CR–05–0064.

United States District Court,
M.D. Pennsylvania.

Sept. 4, 2007.

Patrick A. Casey, Daniel T. Brier, Myers, Brier & Kelly LLP, Scranton, PA, for Louis Pagnotti, III.

Gordon A. Zubrod, U.S. Attorney's Office, Harrisburg, PA, for United States of America.

### MEMORANDUM

THOMAS I. VANASKIE, District Judge.

The issue before the Court is whether the United States used the immunized testimony of Defendant Louis Pagnotti, III, to obtain a second superseding indictment against him in violation of his Fifth Amendment privilege against compulsory self-incrimination. Finding that the Gov-

ernment improperly used Defendant's immunized testimony to indict him, the Court will dismiss the second superseding indictment.

## I. BACKGROUND

### A. Procedural History

The Government effectively obtained four indictments against Louis Pagnotti, III, related to matters that were inquired of him during questioning before a federal grand jury. In accordance with a Compulsion Order under 18 U.S.C. §§ 6002–03, Pagnotti testified before a grand jury on December 3, 2003, regarding financial transactions he had with Frank Pavlico, III, and Pavlico's associated businesses. (Subpoena to Testify, Def.'s Mot. Dismiss Indictment Exs. (Dkt. Entry 32–2) at Bates Stamp No. 000043; Compulsion Order, Def.'s Mot. Dismiss Indictment Exs. (Dkt. Entry 32–2) at Bates Stamp Nos. 000041–42.) On February 9, 2005, the grand jury that heard Pagnotti's immunized testimony indicted him on charges related to a money laundering scheme with Pavlico. (Dkt. Entry 1.) Pagnotti moved to dismiss the indictment on April 1, 2005, claiming the Government used his immunized grand jury testimony to obtain the indictment in violation of his Fifth Amendment right against self-incrimination. (Dkt. Entry 32.)

On May 17, 2006, a separate grand jury, after hearing Pagnotti's immunized testimony before the first grand jury, returned a superseding indictment against Pagnotti. The superseding indictment, in addition to the original money laundering-related charges, included counts for perjury and misprision of marijuana trafficking felonies. (Dkt. Entry 57.) Pagnotti moved to dismiss the superseding indictment, requesting a hearing in accordance with *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), to determine whether the Government used his immunized testimony to obtain the superseding indictment. (Dkt. Entry 71.) The Court granted Pagnotti's request for a *Kastigar* hearing, which was conducted on September 20, 2006. (*See* Tr. of *Kastigar* Hr'g, Sept. 20, 2006 (Dkt. Entry 90).)

On November 8, 2006, before the Court resolved Pagnotti's outstanding motion to dismiss, the Government obtained a second superseding indictment against Pagnotti from yet another grand jury. This indictment repeated the money laundering and misprision of felony charges, but did not include the perjury count. (Dkt. Entry 116.) The grand jury returning the third indictment did not hear or read Pagnotti's immunized testimony.

The Government used yet another grand jury to obtain its fourth indictment against Pagnotti. This indictment is limited to a charge that Pagnotti committed perjury when he testified before the first grand jury in December of 2003. This perjury charge is being prosecuted under a separate docket number, 3:06–CR–00384 (M.D. Pa. filed Nov. 14, 2006), and is not before the Court in this matter.

Pagnotti has moved to dismiss the second superseding indictment as obtained in violation of his Fifth Amendment privilege against compulsory self-incrimination. (Dkt. Entry 140.)[1] The motion has been fully briefed.

---

1. Pagnotti also moved to dismiss the misprision of felony charge, count 17 in the second superseding indictment. The Government has agreed that dismissal of this charge is warranted. (*See* Dkt. Entry 150.) Accordingly, the motion to dismiss count 17 (Dkt. Entry 142) will be granted.

### B. *Findings of Fact* [2]

1. In July, 2000, Special Agent Maria Grabinski with the Internal Revenue Service, Criminal Investigation Unit, initiated an investigation into suspicious banking deposits by Frank Pavlico, III. (Tr. of *Kastigar* Hr'g 16.) Agent Grabinski subpoenaed Pavlico's financial records and discovered that Pagnotti had written three separate checks totaling $116,000 to Pavlico's business, Pavlico Enterprises, Inc. (*Id.* at 24–25.) On February 19, 2003, Agent Grabinski searched Pavlico's business and residence, seizing records of business dealings between Pavlico and Pagnotti, as well as documents related to a criminal prosecution of John Doncses. (*Id.* at 25–27.)

2. Agent Grabinski conducted an interview of Pagnotti on May 8, 2003. (*Id.* at 30–32.) Pagnotti told Agent Grabinski that he conducted business with Pavlico and paid him roughly $100,000 in consulting fees and may have loaned him money. (*Id.* at 31.)

3. Pagnotti was thereafter subpoenaed to testify and produce evidence before the grand jury of the United States District Court for the Middle District of Pennsylvania on August 13, 2003. (Subpoena to Testify, Def.'s Mot. Dismiss Indictment Exs. (Dkt. Entry 32–2) at Bates Stamp No. 000029.) He was also commanded to bring "[a]ny and all documents relating to financial transactions with Frank Pavlico, III, individually, or with businesses controlled by Pavlico." (*Id.*)

4. During his appearance before the grand jury on August 13, 2003, Pagnotti invoked his Fifth Amendment privilege against compulsory self-incrimination. (Tr. of Pagnotti's Aug. 13, 2003, Grand Jury Test., Def.'s Mot. Dismiss Indictment Exs. (Dkt. Entry 32–2) at Bates Stamp Nos. 000082–88.)

5. By Court Order dated November 4, 2003, Pagnotti was compelled to testify and produce evidence before the grand jury pursuant to 18 U.S.C. §§ 6002–6003. (Compulsion Order, at Bates Stamp Nos. 000041–42.) Specifically, the Court ordered that:

> [Pagnotti] shall not be excused from testifying on the grounds that the testimony or evidence required of [him] may tend to incriminate him or subject him to a penalty or forfeiture. However, no testimony or other information compelled under this Order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any other criminal case, except a prosecution for perjury, obstruction of justice, giving false statements, contempt or otherwise failing to comply with this Order.

(*Id.* at Bates Stamp No. 000041.)

6. Pagnotti was subsequently subpoenaed to testify and produce evidence before the grand jury on December 3, 2003. (Subpoena to Testify, at Bates Stamp No. 000043.)

7. During his appearance before the grand jury on December 3, 2003, Pagnotti was questioned about financial transactions he had with Pavlico and his associated businesses. (*See* Tr. of Pagnotti's Dec. 3, 2003, Grand Jury Test., Def.'s Mot. Dismiss Indictment Exs. (Dkt. Entry 32–2) at Bates Stamp Nos. 000051–81.) The United States specifically asked Pagnotti about a $150,000 promissory note that Pavlico

---

**2.** Because the parties had an adequate opportunity to present evidence regarding the use of Pagnotti's compelled testimony at the *Kastigar* hearing conducted on September 20, 2006, and the evidence presented at the first hearing shows impermissible use of Pagnotti's testimony to indict him on the money laundering charges asserted in the second superseding indictment, another *Kastigar* hearing is not required.

gave him in August of 2000 in exchange for a loan, and whether Pagnotti transferred money to Pavlico in exchange for the promissory note. (*Id.* at Bates Stamp No. 000058–000062.) In response, Pagnotti testified that he loaned Pavlico the money to finance a business venture, and that Pagnotti funded the loan by transferring to Pavlico a $150,000 certificate of deposit ("CD") that Pagnotti had at Fidelity Deposit and Discount Bank ("Fidelity Bank"). (*Id.* at Bates Stamp Nos. 000058–000062.) He further testified that Pavlico did not pay his obligations associated with the loan.[3] (*Id.* at Bates Stamp No. 000066.) Pagnotti also explained his involvement in other financial transactions with Pavlico, including a consulting arrangement with Pavlico where Pavlico would find Pagnotti business opportunities. (*Id.* at Bates Stamp Nos. 000064–000071.) At the time of his testimony, Pagnotti was not the subject of a federal criminal investigation.[4] (Tr. of *Kastigar* Hr'g 80.)

8. Before Pagnotti testified before the grand jury, Agent Grabinski stated that the Government possessed a $150,000 promissory note from Pavlico to Pagnotti. (Def.'s Br. Supp. (Dkt. Entry 141) at 6.)

9. There is no competent evidence that the Government was aware that Pagnotti transferred a Fidelity Bank CD to Pavlico before Pagnotti gave his grand jury testimony.[5] Indeed, Agent Grabinski told the grand jury that the Government had been unable to trace whether Pagnotti transferred money to Pavlico in exchange for the promissory note. Specifically, Agent Grabinski testified before the first grand jury as follows:

[Assistant United States Attorney Gordon A. Zubrod]: Now, from whom will we be hearing today?

[Ms. Grabinski]: Louis Pagnotti. As I said earlier—

Mr. Zubrod: That's the individual that made the $150,000 loan in the year 2000 to Mr. Pavlico?

Ms. Grabinski: That's correct. As I explained earlier, we executed search warrants ... [o]n Mr. Pavlico's residence and seized documents relating to business dealings with Louis Pagnotti. We did secure a $150,000 promissory note from Mr. Pagnotti to Mr. Pavlico. And, in addition, we found billing [in-]voices from Pavlico Enterprises to Mr. Pagnotti totaling $116,000. The billing

---

**3.** In addition to repayment of the principal, the promissory note required Pavlico to pay interest at a rate of 5 percent per annum. (Tr. of Pagnotti's Dec. 3, 2003, Grand Jury Test., at Bates Stamp Nos. 000058.)

**4.** As Agent Grabinski stated during the September 20, 2006, *Kastigar* hearing, the Government was only investigating Pavlico before Pagnotti's December 3, 2003, grand jury testimony. (Tr. of *Kastigar* Hr'g 62–63.)

**5.** During the September 20, 2006 *Kastigar* hearing, Agent Grabinski stated, without explication, that she had information about the CD prior to Pagnotti's December 3, 2003, grand jury testimony. (Tr. of *Kastigar* Hr'g 111.) Although the Government had knowledge of Pavlico's possession of a CD with Fidelity Bank in the amount of $150,000 (*see* Aff. for Search Warrant, *Kastigar* Hr'g Ex. 4

(Dkt. Entry 95) at 9), the Government has not shown that it had connected this CD to Pagnotti before he testified. On the contrary, Agent Grabinski's search warrant affidavit asserts that Pavlico had purchased all the Certificates of Deposit that she listed. (*Id.*) There is no indication that any CD had been transferred to him by Pagnotti. In summary, all that the Government has shown is that it knew of the existence of a promissory note from Pavlico to Pagnotti in the amount of $150,000. Contrary to the Government's intimation, the grand jury testimony of Pavlico's accountant (Gavigan) and lawyer (Schermerhorn) does not provide any information concerning the transfer of a CD from Pagnotti to fund the loan. Their testimony and records simply confirmed the existence of the promissory note.

invoices list consulting services as the reason for the payment.

Mr. Zubrod: Now, looking at the records, did you get records from Mr. Pagnotti as well as compare the records seized from Mr. Pavlico.

Ms. Grabinski: That is correct.

Mr. Zubrod: What did you come up with as you analyzed these records?

Ms. Grabinski: The payments referencing the $116,000 billing invoices—

Mr. Zubrod: Let's start with that $150,000 loan.

Ms. Grabinski: Okay. The first item was the $150,000 promissory note, dated August 25th of 2000.

Mr. Zubrod: So you found a promissory note between Mr. Pavlico and Mr. Pagnotti?

Ms. Grabinski: That's correct.

Mr. Zubrod: And then also the tax return where Mr. Pavlico indicated he received $150,000 from Mr. Pagnotti?

Ms. Grabinski: That's correct. *We haven't been able to trace those funds, so we would like to know—*

Mr. Zubrod: *There's no record that that money changed hands;* is that right?

Ms. Grabinski: *Not that we've been able to determine to date.*

Mr. Zubrod: Other than the fact that there's a promissory note that there is going to be a loan dated what date?

Ms. Grabinski: August 25th, 2000.

Mr. Zubrod: There's actually two tax returns indicating that the money was given to him. *But there's no evidence of movement of money between banks or wire transfers or cash payments?*

Ms. Grabinski: *That's correct.*

(Tr. of Grabinski's Dec. 3, 2003, Grand Jury Test. at 8–10 (emphasis added).)

10. Shortly after Pagnotti testified before the grand jury, Assistant United States Attorney Gordon A. Zubrod discussed the substance of Pagnotti's immunized grand jury testimony with Agent Grabinski, including Pagnotti's statements about financial transactions with Pavlico. (Tr. of *Kastigar* Hr'g 55–56, 58, 62.) Agent Grabinski also read a transcript of Pagnotti's December 3, 2003, grand jury testimony. (*Id.* at 53–54.) She discussed the testimony with other agents working with her. (*Id.* at 73–74.)

11. Agent Grabinski admitted that she had hoped to learn about Pagnotti's financial dealings with Pavlico from his grand jury testimony. (*Id.* at 77–78.) She found Pagnotti's testimony concerning the financial transactions "suspicious." (*Id.* at 64.)

12. Afterwards, Agent Grabinski made further investigation into the financial transactions detailed in Pagnotti's testimony. (*See, e.g., id.* at 64, 75.) She also subpoenaed Pagnotti's financial records to verify his statements. (*See Kastigar* Hr'g Ex. 10 (Dkt. Entry 101).)

13. Based on information linking Doncses to Pavlico, Agent Grabinski and other Internal Revenue Service agents interviewed Doncses at the Federal Prison Camp in Allenwood, Pennsylvania, on June 25, 2004. (Tr. of *Kastigar* Hr'g 41–44.) Doncses told the investigators that he converted marijuana trafficking proceeds into gold and silver. (*Id.* at 42.) He said he discussed ways of laundering the drug trafficking proceeds with Pagnotti, whom he met through Pavlico. (*Id.* at 42–43.) One scheme involved laundering drug proceeds through coal company contracts. (*Id.* at 43.) He also believed Pavlico and Pagnotti converted his gold and silver into cash.[6] (*Id.* at 43–44.)

---

**6.** Doncses indicated that Pavlico stole the gold and silver from him. (*Kastigar* Hr'g Ex.

14. In November of 2004, Agent Grabinski worked with Assistant United States Attorney Zubrod in conducting a grand jury investigation of Pagnotti, culminating with the first indictment of Pagnotti in February of 2005. (*Id.* at 80–82.)

15. On November 8, 2006, the Government obtained its second superseding indictment against Pagnotti, charging him with misprision of marijuana trafficking felonies and multiple counts of money laundering. (Dkt. Entry 116.) In obtaining the second superseding indictment, the Government traced a scheme to launder the drug proceeds earned by Doncses. (*Id.* ¶¶ 1–17.) First, Doncses converted proceeds from his marijuana trafficking activities into gold and silver. (*Id.* ¶ 4.) The gold and silver were transferred to Pavlico, then to Pagnotti, who sold it for approximately $400,000. (*Id.* ¶¶ 4–8.) Pagnotti deposited the proceeds of the sale into an account he maintained at the Old Forge Bank in Old Forge, Pennsylvania. (*Id.* ¶ 8.) Pagnotti purchased a $150,000 Fidelity Bank CD, using a check drawn from his Old Forge Bank account. (*Id.* ¶ 9.) He transferred the Fidelity Bank CD to Pavlico in exchange for a promissory note. (*Id.* ¶ 10.) Pagnotti also paid Pavlico three checks totaling $116,000 as "consulting fees." (*Id.* ¶ 12–14.)

## II. DISCUSSION

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege prevents a witness from being " 'forced to give testimony leading to the infliction of penalties affixed to . . . criminal acts.' " *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (*quoting*

12 (Dkt. Entry 103) at 3–4.)

*Ullmann v. United States,* 350 U.S. 422, 438–39, 76 S.Ct. 497, 100 L.Ed. 511 (1956)).

The Government, however, may compel persons to testify in court or before grand juries as long as the testimony is not used in violation of the witness's Fifth Amendment privilege against self-incrimination. *Id.* at 449, 453, 92 S.Ct. 1653. In enacting 18 U.S.C. § 6002, Congress empowered the Government to obtain an order compelling a witness who has invoked his privilege against self-incrimination to testify before a grand jury; "but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." The Supreme Court has upheld the constitutionality of § 6002 "because the scope of the 'use and derivative-use' immunity that it provides is coextensive with the scope of the constitutional privilege against self-incrimination." *United States v. Hubbell,* 530 U.S. 27, 38, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000); *accord Kastigar,* 406 U.S. at 453, 92 S.Ct. 1653.

In this matter, the United States compelled Pagnotti, pursuant to § 6002, to testify before the grand jury on December 3, 2003. The Government was thereafter forbidden to use "any information directly or indirectly derived from [Pagnotti's] testimony or other information" against Pagnotti "in any other criminal case, except a prosecution for perjury, obstruction of justice, giving false statements, contempt or otherwise failing to comply with [the] Order." (Compulsion Order, at Bates Stamp Nos. 000041.) Pagnotti claims that the Government violated the Court's Order

(and consequently § 6002 and his Fifth Amendment privilege against self-incrimination) by using his testimony, both directly and indirectly, to obtain the superseding indictment on November 8, 2006.[7]

Section 6002 provides "a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom." *Kastigar,* 406 U.S. at 460, 92 S.Ct. 1653. Once a defendant demonstrates that he has testified under a grant of immunity to matters related to the federal prosecution, " 'the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.' " *Id. (quoting Murphy v. Waterfront Comm'n of N.Y. Harbor,* 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)). This burden of proof "is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* Consequently, the Government may not use immunized testimony to "obtain leads, names of witnesses, or other information not otherwise available to support a prosecution." *Hubbell,* 530 U.S. at 39, 120 S.Ct. 2037. As summarized in *Kastigar,* § 6002 assures "that the compelled testimony can in no way lead to the infliction of criminal penalties." *Kastigar,* 406 U.S. at 461, 92 S.Ct. 1653.

It is clear that Pagnotti's immunized testimony was related to his federal prosecution, as he testified about financial transactions with Pavlico that the Government charges were part of a money laundering scheme. The Government, therefore, has the burden to prove that the evidence it used to obtain the November 8, 2006 indictment against Pagnotti was derived from "a legitimate source wholly independent of the compelled testimony."

The Government initially argues that all the information revealed by Pagnotti during his December 3, 2003, grand jury testimony was "already in the hands of the investigators at the time." (United States' Br. Opp'n (Dkt. Entry 151) at 15–19.) The Government specifically disputes Pagnotti's contention that it learned about his transfer of the $150,000 Fidelity Bank CD to Pavlico from his immunized testimony. In support of its position, the Government cites Agent Grabinski's statement during the September 20, 2006, hearing that she had information about the CD prior to Pagnotti's immunized testimony. (*Id.* at 15 (*citing* Tr. of *Kastigar* Hr'g 111).)

As noted in the Court's findings of fact, *supra* Part I.B. ¶ 9 and note 5, Agent Grabinski's conclusory statement does not constitute evidence that the Government knew before Pagnotti's immunized testimony that *Pagnotti transferred* the Fidelity Bank CD to Pavlico in exchange for the promissory note. While the Government may have been aware of Pavlico's possession of a CD in the amount of $150,000 before Pagnotti's immunized testimony, it did not know that Pagnotti transferred the CD to Pavlico. On the contrary, Agent Grabinski's search warrant affidavit asserts that Pavlico had purchased the CD in question, along with others, using monies that had been deposited by Pavlico into various accounts. Pagnotti's testimony is significant, as the transfer of the CD ties

7. The November 8, 2006, indictment superseded an indictment issued on May 17, 2006, which itself superseded an indictment obtained on February 9, 2005. (*See* Dkt. Entries 1, 57, 116.) As the first two indictments have been superseded, the only question before the Court is whether the November 8, 2006, indictment was obtained in violation of Pagnotti's privilege against self-incrimination.

Pagnotti into the alleged money laundering scheme with Pavlico. It is undisputed that evidence of Pagnotti's transfer of the CD was presented to the grand jury in November of 2006. (*See* Def.'s Reply Br. (Dkt. Entry 156) at 11–12 n. 7 (*quoting* Grabinski's Nov. 8, 2006, Grand Jury Test., at 11).) The Government has not met its burden of proving that it had obtained the evidence from a legitimate source wholly independent of the compelled testimony. Nor has the Government shown that, absent Pagnotti's testimony, it would have been able to connect the CD to Pagnotti. The transfer of the CD from Pagnotti to Pavlico is a crucial link in the chain of evidence tying Pagnotti into laundering of drug proceeds. Certainly, the existence of the promissory note alone was not sufficient to tie Pagnotti into the money laundering scheme. The critical fact is the actual transfer of funds, and it was Pagnotti's immunized testimony that showed the Government how the funds were transferred.

Furthermore, the Government has failed to demonstrate that Pagnotti's immunized testimony was not used to obtain leads. As Agent Grabinski stated, she found Pagnotti's testimony suspicious. For instance, Pagnotti stated that he was never repaid the $150,000 he loaned to Pavlico, which certainly is curious. Though the Government was aware of business transactions between Pagnotti and Pavlico before Pagnotti testified, these transactions may have

appeared legitimate. Pavlico's failure to repay the $150,000 loan, however, raised serious doubt about the legitimacy of the business dealings between Pagnotti and Pavlico.[8] Significantly, it was only after Pagnotti testified that the Government subpoenaed Pagnotti's financial records and made further investigations into his business dealings with Pavlico. *See supra* Part I.B. ¶ 12. Before Pagnotti testified, the Government was investigating only Pavlico. It was after Pagnotti testified that Pagnotti became the subject of a criminal investigation conducted by Agent Grabinski, who admits that she was informed of Pagnotti's immunized grand jury testimony. Thus, it appears that the Government used Pagnotti's immunized testimony to obtain leads in its investigation of Pagnotti. Stated otherwise, the Government has failed to show that its investigation was not influenced by information obtained from Pagnotti's immunized testimony.[9]

### III. CONCLUSION

The Government's use of Pagnotti's immunized testimony to obtain evidence that he transferred the Fidelity CD to Pavlico and to obtain investigative leads was improper under *Kastigar's* "sweeping proscription of any use, direct or indirect, of . . . compelled testimony and any information derived therefrom." *Kastigar*, 406 U.S. at 460, 92 S.Ct. 1653. Accordingly,

---

8. Pagnotti's immunized testimony concerning consulting fees paid to Pavlico also raised suspicion. As the Government observed in questioning Pagnotti before the grand jury, it was odd that Pagnotti paid Pavlico fees for leads that had not actually generated business. (*See* Tr. of Pagnotti's Dec. 3, 2003, Grand Jury Test., at Bates Stamp Nos. 000067–68.) This testimony may also have caused the Government to investigate the legitimacy of Pagnotti's business dealings with Pavlico.

9. The Government does not specifically argue that the use of Pagnotti's testimony was harmless. Regardless, use of the testimony was not harmless. Evidence that Pagnotti transferred money derived from selling Doncses' gold and silver via a CD was significant in tying Pagnotti into the charged money laundering scheme. Doubt raised by Pagnotti's testimony was also significant in the Government's decision to further investigate his business dealings.

Defendant's motion to dismiss the November 8, 2006, indictment will be granted.[10] An appropriate Order follows.

## ORDER

**NOW, THIS 4th DAY OF SEPTEMBER, 2007,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion to Dismiss Count 17 of the November 8, 2006 Indictment (Dkt. Entry 142) is **GRANTED.**

2. Defendant's Motion to Dismiss the November 8, 2006 Indictment (Dkt. Entry 140) is **GRANTED.** The Indictment against him is **DISMISSED.**

3. Defendant's Motion to Dismiss the February 9, 2005 Indictment (Dkt. Entry 32), Motion to Sever Defendant Pursuant to Fed.R.Crim.P. 14 (Dkt. Entry 34), Motion for Bill of Particulars (Dkt. Entry 36), Motion to Dismiss Count Twenty–Three (Dkt. Entry 69), Motion to Dismiss the May 17, 2006, Indictment and Request for *Kastigar* Hearing (Dkt. Entry 71), Motion to Compel the Production of Statements and Testimony of Witnesses (Dkt. Entry 73), and Motion for Reconsideration of Order Quashing Subpoenas (Dkt. Entry 87) are **DISMISSED AS MOOT.**

---

**10.** The parties have presented arguments concerning whether dismissal of the indictment should be done with prejudice. That issue is not ripe.